[Civ. No. 50149. First Dist., Div. Two. June 23, 1981.]

CITY OF MONTEREY, Plaintiff and Respondent, v.
CALIFORNIA COASTAL COMMISSION et al., Defendants,
Cross-defendants and Appellants;
DALE C. RUNYAN, Defendant, Cross-complainant and Respondent.

**800**

[redacted]

**COUNSEL**

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, Dennis Eagan and Kathleen W. Mikkelson, Deputy Attorneys General, for Defendants, Cross-defendants and Appellants.

William C. Marsh, City Attorney, for Plaintiff and Respondent.

Brian Finegan for Defendant, Cross-complainant and Respondent.

**OPINION**

**TAYLOR, P. J.**—Regional and state coastal commissions appeal from a judgment granting declaratory and injunctive relief to the City of Monterey (City) and the owner, Dale Runyan (Runyan), thereby permitting the reconstruction of certain historic buildings on Cannery Row without a coastal permit pursuant to the "repair" exceptions of Public Resources Code[1] section 30610, subdivision (d) to abate a nuisance (§ 30005, subd. (b)).

On November 26, 1980, during the pendency of this appeal, a fire destroyed all but a small portion of the buildings on Cannery Row.[2] The only remaining issue is whether Runyan is entitled to the "natural disaster" exception to the coastal permit requirement of section 30610, subdivision (g). For the reasons set forth below, we have concluded that the instant matter is moot, and that the judgment must be dismissed.

The pertinent chronology of the facts as revealed by the record and found by the court is as follows:

In March 1977, Runyan had an option to purchase a warehouse at 818 to 850 Cannery Row. The warehouse is located on a marine terrace overlooking the Pacific Ocean and lies within the permit area, as defined by the coastal act.[3] On March 11, 1977, the City's chief building inspector wrote a letter to the owners and Runyan, declaring that the

---

[1]All future references are to the Public Resources Code unless otherwise indicated. At the time the instant litigation commenced, section 30610, subdivision (d) was subdivision (c); the redesignation was made by Statutes of 1979, chapter 919, section 8.

[2]On March 13, 1981, we granted the commissions' unopposed motion to file supplemental briefs and took judicial notice of the fire (*People* v. *Preslie* (1977) 70 Cal.App.3d 486, 492-495 [138 Cal.Rptr. 828]). On April 15, 1981, Runyan filed a letter asserting that the fire did not moot the nuisance and repair issues; he cited no authorities and made no attempt to seek relief from his default in failing to file a timely opposition to the motion.

[3]Any person wishing to perform any development in the permit area, as defined by the coastal act, was required to obtain a permit authorizing the development from the appropriate body (§ 30160). Subject to certain exceptions, the permit area extends seaward to the outer limit of the coastal zone and landward for a distance of 1,000 yards from the mean high tide line (§ 30103; *Aries Dev. Co.* v. *California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534 [122 Cal.Rptr. 315]). The parties agree that Runyan's property was that not removed from the jurisdiction of the coastal commissions by Public Resources Code section 30160, subdivision (d) (Stats. 1979, ch. 1109, § 1; Stats. 1980, ch. 170, § 1, eff. June 12, 1980).

building was dangerous, as defined by the Uniform Code for the Abatement of Dangerous Buildings.[4] The letter also indicated that: 1) the building would have to be demolished or rehabilitation plans approved and work commenced within 60 days; 2) no new occupancy would be permitted; and 3) if any required work was not commenced within the specified time, the building inspector might require the building to be vacated and posted to prevent further occupancy, and have the remedial work done, with the costs charged to the property or its owner. At this time, about 32,000 square feet of the 71,000 square feet of the warehouse were occupied by a theater, art gallery, record store, lobster operation, jelly factory and refrigeration company; only about 4,500 square feet of the warehouse was used for commercial purposes.[5] Thereafter, the City refused to allow new occupancies in the warehouse.

On January 10, 1978, Runyan applied to the regional commission for a coastal permit to restore the warehouse. Runyan's proposed plans called for a renovation of the warehouse into a 42,000-square-foot commercial center consisting of approximately 50 stores. His plans called for demolition of some portions of the buildings and construction of new second story space. The resulting project would have resulted in a net increase of 10,000 square feet of new rental space.[6] On March 13, 1978, the regional commission approved the permit application, but imposed restrictions relating to water consumption, parking, traffic congestion and public access. The occupancy of the structures was limited to a level of use consistent with existing parking demands and water consumption until the "Local Coastal Program" (LCP)[7] for the area was certified.

Runyan appealed to the state commission those terms of the permit that imposed public access and historical easements and restrictions on any occupancy that would intensify parking or water usage. On May 2,

[4]In July 1975, the City had declared that the warehouse was dangerous under section 302 of the Uniform Code for the Abatement of Dangerous Buildings.

[5]Two thousand one hundred square feet were used for an antique warehouse and 12,870 square feet for storage by the Trading Company.

[6]Although not specifically so stated in the record, we must assume that since Runyan applied for a coastal permit, his proposed remodeling was in excess of that required simply to abate the nuisance pursuant to section 30610, subdivision (d).

[7]Section 30500 et seq. provide that each local government will formulate an LCP for its area of jurisdiction within the coastal zone. The LCP is to be certified by the state commission no later than July 1, 1981 (§ 30518).

1978, the state commission concluded that Runyan's appeal raised no substantial issue.

In June 1978, the City filed a complaint against Runyan seeking: 1) a mandatory injunction to require him to abate the public nuisance on his property; and 2) declaratory relief against Runyan and the regional commission to determine whether the proposed restoration and expansion of the project could proceed without complying with the terms of the coastal permit.

Runyan answered and alleged that he was willing to restore the Cannery Row warehouse but could not do so under the terms and conditions imposed by the regional commission. Subsequently, on June 30, 1978, Runyan filed his cross-complaint against the regional and state commissions, seeking declaratory relief and mandamus pursuant to Code of Civil Procedure section 1094.5. His motion for declaratory relief sought an exemption from the coastal permit requirements; his petition for a writ of mandate sought to set aside certain permit conditions on the grounds that the regional commission had acted improperly and that the state commission erred in its findings and conclusions.

After a trial, the court ruled in favor of Runyan's mandate cause of action on grounds that he had been denied a fair hearing and due process, and remanded that portion of the case to the regional commission for a new coastal permit hearing. As to the City's action for injunctive relief, the court ruled that Runyan's cross-complaint for declaratory relief action pertained only to the amount of work that could be done without a coastal permit pursuant to section 30005, subdivision (b) and section 30610, subdivision (d).

On August 20, 1979, the regional commission granted Runyan a second coastal permit. Pursuant to the second permit, Runyan was allowed to demolish portions of the existing building and reconstruct a total of 27,200 square feet of space which could be leased for commercial and visitor-serving uses, along with a 9,000-square-foot plaza. The regional commission, inter alia, eliminated the prior condition which had allowed Runyan to build more space than he might eventually be able to occupy if the LCP provided for lower intensity use on the site, clarified the location of access, and modified or added other conditions as set forth below.[8]

---

[8]The second permit: 1) prohibited restaurant or food services; 2) required submission of final plans to assure that the historical wooden facade of the warehouse would be

On August 31, 1979, Runyan appealed the second permit to the state commission. On October 2, 1979, the state commission determined that the appeal did not raise a substantial issue.[9] Runyan chose not to challenge this action of the commissions by mandate (see *Briggs* v. *State of California* (1979) 98 Cal.App.3d 190, 200-202 [159 Cal.Rptr. 390]).

On November 2, 1979, the court held a further hearing on the City's injunctive and declaratory relief causes of action. Runyan maintained that the proposed project should be approved without any conditions to abate the nuisance which existed on his property.

At the conclusion of the hearing, the court: 1) discharged the original writ of mandate and issued the injunction requested by the City; 2) granted Runyan the relief requested by declaring that Runyan was entitled to make certain repairs to his building and that after the repairs were completed, he could use the building for the same purposes in the same amount of square footage as was in use at the time the City ordered him to abate the nuisance. The court, however, postponed its decision as to the controlling date and as to the amount of square footage he could use for industrial or commercial purposes, pending the presentation of further evidence by the parties on these matters.

After final hearing on January 11, 1980, the court entered its final judgment as follows: 1) Runyan was permitted to reconstruct the warehouse as it existed on March 11, 1977; 2) the usage of the warehouse was not to exceed 32,000 square feet, including: 14,425 square feet of

---

preserved and that there would be signs indicating the location of open space and other public areas and facilities; 3) required an access program providing vertical accessways, as well as a lateral accessway along the shoreline; 4) required public rest rooms; 5) specified that the total water use of the project (excluding public restrooms) would not exceed 1,360 gallons per day; 6) 54 parking spaces that could include the 29 space "credit" granted by the City and an agreement to cooperate with the City in providing parking spaces; 7) provided that the use of the public plaza for special events could not occur during the peak use hours (6-9 p.m. on Friday and Saturday evenings) unless Runyan could show that adequate parking would be available; 8) required an agreement not to hold public agencies responsible for damage from seismic hazards that existed on the property, and an engineering analysis of any measures necessary to protect the project from seismic sea waves (tsunamis); 9) approval by the State Lands Commission and the City of any uses of the property proposed on or over public trust lands; and 10) mitigation of archeological impacts of the project.

[9]We can take judicial notice of the fact that the second permit expired a year later, as Runyan had never accepted it and no work had been commenced.

commercial space; 11,058 square feet of light manufacturing space; and 6,517 square feet of industrial space. The court also retained jurisdiction until the certification of the area's LCP to enable a determination of whether any unauthorized intensification of use had occurred.

On November 26, 1980, after the filing of the opening briefs, a fire destroyed the warehouse. Runyan's reply brief chose to ignore this fact. The state and regional commissions, however, moved to file supplemental briefs, discussed above at footnote 2, on page 801.

We note that the fire not only destroyed the dilapidated buildings which the City sought to have restored or demolished but also destroyed the foundation for the judgment below. The trial court's findings specifically referred to the abatement of the nuisance of the then existing buildings, as follows: "3. Due solely to the existence of the nuisance and the Order of Abatement issued by the City of Monterey, Runyan may make certain repairs to his buildings without a Coastal Development Permit, as necessary to bring the buildings into code compliance; such repairs being made under the repair exemption (PRC § 30610) for the purpose of abating the nuisance (PRC § 30005 [b])."

Since the fire has mooted the nuisance and repair issues (*In re Rosegarten* (1947) 81 Cal.App.2d 126, 128-129 [183 P.2d 360]), we turn only to the application of section 30610, subdivision (g), set forth, so far as pertinent, below.[10] The section thus provides that a building destroyed by a natural disaster can be rebuilt in the same location, 110 percent of the height, bulk and floor area, and for the same use as the original building.

The application of section 30610, subdivision (g) is not moot: 1) as it relates to a matter of public interest, there is great likelihood that the

---

[10]"Notwithstanding any provision in this division to the contrary, no coastal development permit shall be required pursuant to this chapter for the following types of development and in the following areas: . . . .

"(g) The replacement of any structure, other than a public works facility, destroyed by natural disaster. Such replacement structure shall conform to applicable existing zoning requirements, *shall be for the same use as the destroyed structure, shall not exceed either the floor area, height, or bulk of the destroyed structure by more than 10 percent, and shall be sited in the same location on the affected property as the destroyed structure.*

"As used in this subdivision, 'natural disaster' means any situation in which the force or forces which destroyed the structure to be replaced were beyond the control of its owner" (italics added).

matter will arise again in the future, and the public interest issues involved are of immediate concern to individuals not directly involved in the instant proceedings (*Clark* v. *Patterson* (1977) 68 Cal.App.3d 329 [137 Cal.Rptr. 275]); 2) resolution of the action is likely to affect the future rights of the parties before the court (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193]); and 3) significant issues remain requiring resolution (*Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717]).

There is also a great likelihood that the matter will arise again, as Runyan has been attempting to do something with his Cannery Row property since he purchased it in 1977. He has filed two permit applications with the commissions, and has been involved in the instant litigation since June 1979. We note that Runyan filed his reply brief after the fire had occurred, but made no mention of the fire. This is inexcusable. Section 30610, subdivision (g) apparently would allow him less area and usage of his warehouse than the judgment. The controversy over the application and interpretation of section 30610, subdivision (g) should be resolved now to avoid further delay to the parties and the necessity of further litigation, particularly since this issue is primarily a legal one (*Di Giorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487]).

As indicated in *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555], the certainty afforded by appellate resolution of such a question is preferable to the uncertainty that would be engendered by a failure to resolve the issue. We "should not avoid the resolution of important and well litigated controversies arising from situations which are 'capable of repetition, yet evading review.'" (*In re William M.* (1970) 3 Cal.3d 16, 23, fn. 14 [89 Cal.Rptr. 33, 473 P.2d 737].)

As the trial court's findings and judgment are moot (see 2 Witkin, Cal. Procedure (1970) pp. 920-921, § 45; *In re Rosegarten, supra*, 81 Cal.App.2d 126, 128-129), we cannot yet render an effective decision concerning the application of section 30610, subdivision (g). From the record before us, we cannot tell whether Runyan's proposed structure is 110 percent of the size and will involve the same use exercised just prior to the fire. If Runyan chooses to rebuild accordingly, no coastal permit would be required, as all of section 30610 must be construed in pari materia (*Union Oil* v. *South Coast Regional Com.* (1979) 92 Cal.App.

3d 327, 331 [154 Cal.Rptr. 550]). We also note that the City's brief, at page 9, concedes that if Runyan were to build a different building, the City would share the concern of the state and regional commissions.

Finally, we reiterate that it is not the function of an appellate court to make city planning decisions, at least until a record is established (*Coastal Southwest Dev. Corp.* v. *California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 539 [127 Cal.Rptr. 775].)

Accordingly, we can only conclude that the judgment must be dismissed as moot. Runyan now has the following alternatives: 1) to apply for a permit from the City pursuant to section 30610, subdivision (g); or 2) to apply to the coastal commission for a permit to construct a building larger than that allowed under section 30610, subdivision (g). Were we called upon to rule on the judgment, we would reverse, as the project exceeds the scope of the repair and nuisance exceptions (§§ 30610, subd. (d), 30005, subd. (b).)

The appeal is dismissed as moot and the trial court is directed to dismiss the action.

Miller, J., and Smith, J., concurred.