[No. B207188. Second Dist., Div. Two. Dec. 1, 2008.]

MARTIN L. BURKE, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

## Counsel

Pacific Legal Foundation and J. David Breemer for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Christiana Tiedemann, Acting Assistant Attorney General, and John A. Saurenman, Deputy Attorney General, for Defendant and Respondent.

## Opinion

**BOREN, P. J.**—This case arises from the denial of a permit by respondent California Coastal Commission (the Coastal Commission) to replace an existing but deteriorating chain link fence, approximately 1,000 feet long, located on private property at the bottom of the bluffs at a Torrance beach. A 1988 boundary agreement with the State Lands Commission, other entities of the State of California (the State), the City of Torrance (the City), and affected homeowners specifically described the fence as an essential component of an agreed-upon boundary separating a sandy beach easement for public use from adjacent privately owned land. We find that because this type of boundary settlement with the State Lands Commission is statutorily

exempt from the purview of the Coastal Commission (Pub. Resources Code, § 30416),[1] the Coastal Commission had no jurisdiction to require a permit for the fence.

Thus, the trial court erred in denying appellant Martin L. Burke's petition for writ of administrative mandamus to vacate the permit denial and for declaratory relief to establish the Coastal Commission's lack of jurisdiction.

## FACTUAL AND PROCEDURAL SUMMARY

*The history of the fence and the nature of the property.*

Burke owns a home and has a private leasehold interest in land (with an option to purchase) at 533 Paseo de la Playa Drive in the City.[2] His home is on top of a bluff overlooking the ocean, with the bluff sloping down to a public beach below. A portion of the disputed chain link fence is on his property at the very bottom of the bluff. The fence separates his property from an area used as a public beach.

Other homeowners on the same side of the street have similarly situated lots. Burke is the agent for over a dozen neighboring homeowners and fence permit applicants who also have private lots on top of the bluffs, which slope from the higher ground on Paseo de la Playa Drive down to the public beach. Other sections of the chain link fence similarly separate the bottom of the bluffs on these other lots from the back of the public beach.

The bluffs have been dangerously unstable. In 1974, an Attorney General memorandum indicated that almost a third of the bluffs on the lots were "nearly vertical." In 2005, the Coastal Commission staff recommended denial of an unrelated permit request for shade structures at the toe and on the face of the bluff. The staff report emphasized that, "[h]istorically the sandy bluffs immediately inland of [Torrance] beach have suffered from sloughing and collapse," and this has "been hazardous for beach visitors climbing on the bluffs." For example, in the late 1950's, a trespassing youth died when a portion of the bluff caved in. In 1965, another youth died and one was injured when a portion of the bluff collapsed as they attempted to climb on it.

At some point soon after these fatal injuries, a chain link fence was lawfully erected at the bottom of the bluffs to keep people off the bluff faces. According to numerous Paseo de la Playa Drive residents and longtime Los

---

[1] Unless otherwise indicated, all further statutory references are to the Public Resources Code.

[2] Don Ja Ran Construction Company, Inc., and Peerless Building Corporation hold fee simple interests in the lots on which the fence is located.

Angeles County lifeguards at the Torrance beach, a fence existed in some form prior to 1973 and at least since 1968.[3] Burke observed a fence on his lot when he moved there in 1972.

However, there is no evidence that the early fence or fences are the ones that exist today. In fact, at least portions of the fence have been rebuilt several times, and some evidence indicates that a fence may not have existed on February 1, 1973. As noted in a Coastal Commission staff report in January of 2006, "the 1972 aerial oblique photos of the Torrance Bluffs taken by the Department of Navigation and Ocean Development and obtained from the Commission's files . . . do not show a fence at this location." Burke acknowledged that he sought funds from the homeowners in 1973 to rebuild the fence after a storm had destroyed it. In 1974 Burke obtained a building permit from the City to build the fence, in the spring of 1974 a fence was built, and in 1981 Burke obtained a permit from the City for a replacement fence.

Meanwhile, in 1973 the South Coast Regional Commission (the Regional Commission) of the Coastal Zone Conservation Commission, the predecessor of the Coastal Commission, issued an administrative permit for a 560-foot-long fence at the bottom of the bluff along five lots north of the portion of the fence on Burke's lot. In 1975, the Regional Commission approved a 410-foot-long, six-foot-high fence at the bottom of the bluff along one large lot south of the fence on Burke's lot. The Regional Commission's permit approval noted that the fence was "temporary and subject to removal upon resolution of [other then pending] litigation." The Regional Commission further found that "although the fence is aesthetically disturbing, it is also a necessity to protect the natural bluffs from climbers and other misuses" and thus "to reduce man-made erosion."

Moreover, the bluffs in many places contain habitat for the endangered El Segundo blue butterfly. In 1995, the United States Fish and Wildlife Service gave written notice to the Coastal Commission that "[t]he host plant for the El Segundo blue butterfly . . . an endangered species, is located in patches throughout the bluff face on many of the lots along Paseo de la Playa." The delicate "dune buckwheat" plant is the host plant for that butterfly. According to the Coastal Commission's staff ecologist, that habitat "is easily disturbed by human activities."

---

[3] The year 1973 is significant because under the Coastal Act (California Coastal Act of 1976 § 30000 et seq., derived from former California Coastal Zone Conservation Act of 1972, § 27000 et seq.), a coastal development permit from the Coastal Commission is required for development in the coastal zone commenced *after* February 1, 1973, but a permit is not required for substantial, lawful construction projects commenced prior to that date. (See *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 63 [227 Cal.Rptr. 667, 720 P.2d 15].)

*The 1988 Boundary Agreement.*

In the early 1970's, a dispute arose between the City and the property owners along Paseo de la Playa Drive regarding the right of the public to access private land at the base of the bluffs along the back of the beach. The City filed a quiet title action against the property owners based on alleged prescriptive rights to the disputed upland portion of the sandy beach area. Burke negotiated a preliminary settlement on behalf of himself and the other affected homeowners. This preliminary agreement gave the public access to private sandy beach property at the bottom of the bluffs, while allowing the property owners to keep the fence to prevent trespassing and to mark the property boundaries.

However, some delays ensued, and the preliminary agreement was not formalized until 1988. On September 12, 1988, the State Lands Commission, the City, the Attorney General's Office, the homeowners along Paseo de la Playa Drive, and Governor George Deukmejian signed a formal boundary agreement. (See § 6107.) This 1988 boundary agreement established a boundary line between private and state ownership of property. The property owners quitclaimed to the State all of their right, title and interest to lands seaward of the agreed boundary. The property owners also agreed to dedicate a public easement landward of the line over a strip of private sandy beach property at the bottom of the bluffs. With this public easement excepted, the State and the City quitclaimed to the property owners all public interest landward of the agreed boundary line.

The State and the City further agreed that the property owners could maintain a fence at the bottom of the bluffs. As specified in the agreement: "Notwithstanding the public easement the [owners have] the continuing right to construct, repair and maintain an eight (8) foot chain link fence on the landward boundary of the Sandy Beach Portion and to have access to the Sandy Beach Portion to facilitate said construction, repair and maintenance."

Thus, the fence at the bottom of the bluffs is not on the agreed boundary line separating private from public ownership of land; that boundary would be the mean high tide line.[4] Rather, the fence is located landward of the agreed boundary line and marks the easterly boundary of the sandy beach easement area.

---

[4] The common law boundary of tidelands is the mean high tide line. (*Lechuza Villas West v. California Coastal Com.* (1997) 60 Cal.App.4th 218, 239, fn. 16 [70 Cal.Rptr.2d 399] (*Lechuza*).) "[T]he general rule is that a line shown on a map which runs along the edge of the

*Administrative proceedings.*

In 2005, Burke sought to repair the fence on his behalf and that of other affected homeowners who consented to his representation. The Coastal Commission required a coastal development permit for an "after-the-fact" approval and replacement of the fence. On his own behalf and that of 14 other property owners, Burke submitted such an application. The Coastal Commission processed the application as a global one for fencing on all of the lots in question along Paseo de la Playa Drive.

In April of 2006, the Coastal Commission staff issued a report recommending denial of the requested permit for an eight-foot-high, 930-foot-long chain link fence along the toe of the bluffs on the sandy beach area. The public hearing initially scheduled was continued to allow the parties time to submit evidence as to whether the fence predated the Coastal Act (actually, its predecessor statute) and was therefore outside the Coastal Commission's jurisdiction. Thereafter, Burke submitted declarations from people who lived in the area and from Los Angeles County lifeguards indicating that a fence or fences existed at various times prior to 1973.

In June of 2006, the Coastal Commission staff issued a report questioning the value of such declarations, concluding there was insufficient evidence that the fence existed prior to the Coastal Act, and again recommending the denial of a permit for the fence. The staff report additionally found that the 1988 boundary agreement did not divest the Coastal Commission of jurisdiction to deny the fence permit. It reasoned that the Coastal Commission did not sign the boundary agreement, and none of the state entities that did sign the agreement could waive the permit requirement on the Coastal Commission's behalf.

The Coastal Commission staff report acknowledged that "the requested [fence] structure does not physically impede public access to the adjacent beach area." Also, a prior staff report, in the context of an unrelated permit application, had found that the fence appears "open and does not block views

ocean is a meander line, used to ascertain the quantity of land subject to sale and to show the sinuosities of the shore, and that the high tide line, not the meander line, is the true legal boundary." (*Id.* at p. 240.)

"The State owns all tidelands below the ordinary high water mark, and holds such lands in trust for the public (Civ. Code, § 670; *State of Cal.* ex rel. *State Lands Com. v. Superior Court* (1995) 11 Cal.4th 50, 63 [44 Cal.Rptr.2d 399, 900 P.2d 648]), while the owners of land bordering on tidelands take to the ordinary high water mark. (Civ. Code, § 830; *State of Cal.* ex rel. *State Lands Com. v. Superior Court, supra,* 11 Cal.4th at p. 63.)" (*Lechuza, supra,* 60 Cal.App.4th at p. 235.) However, the mean high tide line is subject to the accretion and erosion of the shore from natural causes. Hence, the mean high tide line is a boundary that is ambulatory and not fixed. (*Lechuza, supra,* 60 Cal.App.4th at pp. 235–239.)

from the beach looking inland." However, the staff report on Burke's permit application found the fence "obviously and significantly changes the view of the bluff from the beach." It surmised that the fence might harm public access because "visitors generally do not want to lie on sand at the base of a private, 8-foot tall, chain link fence, and it transforms the experience of the area from one of open space to one of being in the shadow of someone's fenced in yard." The staff report also speculated about harm to the public access because "property owners along Paseo de la Playa may seek to intensify use of their properties along the face and toe of the bluff if the proposed [fence] is approved."

In July of 2006, the Coastal Commission held its final hearing on Burke's application. During the course of the hearings, the Coastal Commission staff suggested that Burke could propose a split rail fence, which might be a feasible alternative to the chain link fence because it "would be more compatible with the natural conditions along this stretch of beach front." No evidence was offered at the hearings as to whether safety issues and habitat preservation concerns could be satisfied by the installation of a split rail fence. After Burke, the Coastal Commission staff director, and a Sierra Club representative addressed the commissioners, the Coastal Commission adopted the findings in the staff report and denied Burke's permit application.

*Trial court proceedings.*

Burke filed in the superior court a petition for a writ of administrative mandamus and a complaint for declaratory and injunctive relief. The petition asserted, in pertinent part, that the Coastal Commission had no jurisdiction to deny the permit for the fence because of the 1988 boundary agreement, that the denial violated the Coastal Act, that the Coastal Commission's findings were not supported by substantial evidence, and that the Coastal Commission should be estopped from denying the permit for the fence. Burke submitted briefing on the issues raised in the petition and moved for judgment on the petition.

The trial court entered judgment in favor of the Coastal Commission. Burke appeals.

## DISCUSSION

I. *The standard of review.*

Burke challenges the Coastal Commission's actions by a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5. (See § 30801 [authorizing any "aggrieved person" to seek judicial review of

Coastal Commission decisions].) Our inquiry extends to whether the agency acted in excess of jurisdiction or abused its discretion by not proceeding in a manner required by law. (Code Civ. Proc., § 1094.5, subd. (b); *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1343 [44 Cal.Rptr.3d 867].)

Where jurisdiction involves the interpretation of a statute, the issue of whether an agency acted in excess of its jurisdiction is a question of law reviewed de novo on appeal. (*Schneider v. California Coastal Com., supra,* 140 Cal.App.4th at pp. 1343–1344; *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].) Moreover, courts do not defer to an agency's determination when deciding whether the agency's action lies within the scope of authority delegated to it by the Legislature. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1988) 19 Cal.4th 1, 11, fn. 4 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

II. *The fence is exempt from the Coastal Commission's jurisdiction because it is an integral part of a boundary settlement, within the meaning of the statutory exemption in section 30416, subdivision (c).*

■ The Coastal Act provides in section 30416, subdivision (c), as follows: "Boundary settlements between the State Lands Commission and other parties and any exchanges of land in connection therewith shall not be a development within the meaning of this division." The Coastal Commission can require a permit only for activities in the coastal zone that constitute a "development." (§ 30600, subd. (a); see *Halaco Engineering Co. v. South Central Coast Regional Com., supra,* 42 Cal.3d at p. 62.) A "development" is defined by statute as including "the placement or erection of any solid material or structure; [and] . . . construction, reconstruction, demolition, or alteration of the size of any structure . . . ." (§ 30106.) Thus, to the extent the erection or reconstruction of the fence is a "boundary settlement," the Coastal Commission has no authority to require a permit and thus lacks jurisdiction over the fence.

The 1988 boundary agreement was negotiated for the purpose of settling boundary disputes over public versus private lands at the Torrance beach. It was executed pursuant to section 6107, a provision authorizing the State Lands Commission to enter into settlements.[5] The fence was specifically included in the 1988 boundary agreement to establish a fixed boundary line between the private and public use of property. As stated in the agreement,

[5] Section 6107 provides, in pertinent part, as follows: "Whenever the [State Lands] [C]ommission, pursuant to authority granted to it by law, enters into any agreement for the compromise or settlement of claims, the agreement shall be submitted to the Governor, and if approved by him shall thereupon . . . be binding upon the State and the other party thereto."

"the reason for the establishment of this boundary line is to bring the landward boundary of the 'Sandy Beach Portion' [i.e., the public easement area] into a uniform description based on physical landmarks." The physical landmark is the fence.

■ Also, the Coastal Commission staff report indicated that the staff had consulted with representatives from the State Lands Commission and the Attorney General's Office and confirmed that "the ability to construct, repair and maintain this fence was a key part of the boundary line agreement for the private property owners." As Burke explained to the Coastal Commission staff, the 1988 boundary agreement could not have occurred without the "unimpeded right to construct and maintain the fence." It is thus apparent that the fence is an integral part of a "boundary settlement" within the meaning of section 30416, subdivision (c).

It is of no consequence that the fence is not actually *on* the boundary separating private from public ownership of land. It cannot be. As previously noted, because the mean high tide line—the boundary between public and private lands—is subject to the accretion and erosion of the shore from natural causes, that boundary is by its nature ambulatory and not fixed. (*Lechuza, supra*, 60 Cal.App.4th at pp. 235–239.) It would be impossible to use a stationary fence to mark an ambulatory boundary. However, the fence here functions not as the boundary marker for the mean high tide line, but rather as the boundary marker for the landward side of the sandy beach easement area.

Contrary to the Coastal Commission's assertion, a boundary is a concept not narrowly limited to a line separating property *ownership*. The notion of a boundary may also include, for example, surveying and mapping subdivisions of state lands (§ 6202), and surveying and marking the lines of counties and cities (§ 6204). Consistent with this broader understanding of a boundary, the fence here, which marks the boundary between public use (not ownership) and private ownership, demarcates a boundary settlement.

The Coastal Commission also argues that the plain language of the statute does not support the conclusion that section 30416, subdivision (c), applies to any physical activity that may impact the environment. Rather, the Coastal Commission apparently urges that the statute only applies to the written boundary agreement itself. It thus contends that the exemption to its jurisdiction in section 30416, subdivision (c), is limited to "the setting of a boundary and not to physical development in the coastal zone."

■ However, the only authority the Coastal Commission has is over development in the coastal zone. The Coastal Act's "cardinal requirement"

(*California Coastal Com. v. Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 587 [170 Cal.Rptr. 263]), and its central enforcement mechanism, is the requirement that anyone seeking to undertake a *development* within the coastal zone must first obtain a coastal development permit (§ 30600, subd. (a)). The Coastal Commission has no statutory authority over "the setting of a boundary" or settling boundary disputes. So, the notion that the statute only exempts the Coastal Commission from jurisdiction over a written boundary agreement, when it has no authority to establish or settle a boundary, would be an unreasonable statutory interpretation and one to be avoided. (See Civ. Code, § 3542.)

■ We acknowledge, of course, the overriding environmental and eco-logical objectives of the Coastal Act, which "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 [205 Cal.Rptr. 801, 685 P.2d 1152]; see § 30001, subds. (a)–(d).) Moreover, the Coastal Act must be "liberally construed" to accomplish its objectives (§ 30009), and any exception to a statute's main purpose must be strictly construed. (See *Howard Jarvis Taxpayers Assn. v. County of Orange* (2003) 110 Cal.App.4th 1375, 1384 [2 Cal.Rptr.3d 514]; *Marrujo v. Hunt* (1977) 71 Cal.App.3d 972, 977 [138 Cal.Rptr. 220].)

■ Here, the Legislature has specifically carved out section 30416, subdivision (c), as an exemption from the otherwise expansive coverage of the Coastal Act.[6] This statutory exemption promotes the State's interest in settling land disputes and represents the Legislature's determination that the "promoted . . . interest [is] important enough to justify forgoing the benefits of environmental review." (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 382 [267 Cal.Rptr. 569, 787 P.2d 976], discuss-ing statutory exemptions for projects from the CEQA review process.) Just as with a project under CEQA, if a development under the Coastal Act fits within the language of the statutory exception, the exemption applies even though the consequence may be some aesthetic or other harm to the environment. (*Napa Valley Wine Train, Inc. v. Public Utilities Com., supra*, at p. 382.)

■ The exemption in section 30416, subdivision (c), whereby boundary settlements with the State Lands Commission may not be deemed a develop-ment for the purposes of the Coastal Act, removes such settlements from the

---

[6] In a parallel fashion, the Legislature has also carved out a boundary settlement exemption from the otherwise broad scope of the California Environmental Quality Act (CEQA) (§ 21000 et seq.). Section 21080.11 provides as follows: "This division shall not apply to settlements of title and boundary problems by the State Lands Commission and to exchanges or leases in connection with those settlements."

purview of the Coastal Commission. We conclude that where the boundary settlement intimately involves a physical boundary marker, such as a fence, the marker is part of the boundary settlement, within the meaning of section 30416, subdivision (c), and thus exempt from the jurisdiction of the Coastal Commission.

The Coastal Commission overstates Burke's argument and posits a chamber of horrors if his position is adopted. The Coastal Commission fears that *any* physical activity that would normally constitute a development under the Coastal Act would be exempt from Coastal Commission review if it were part of a formal boundary settlement. Our interpretation of the statute, however, is narrower and more focused than that: a physical boundary marker that is an integral part of a boundary settlement executed by the State Lands Commission is exempt from Coastal Commission oversight because it is not a "development" within the meaning of section 30416, subdivision (c).

Accordingly, the trial court erred in denying the petition for a writ of mandate to compel the Coastal Commission to vacate its denial of a permit, and in refusing Burke's request for a declaration that the Coastal Commission lacks jurisdiction over the fence because of the 1988 boundary agreement.

III.   *Other issues.*

Burke raises several other contentions. He argues that the Coastal Commission lacked jurisdiction to require a permit because the 1988 boundary agreement vests a right to the fence and estops the State, and because substantial evidence establishes that the fence predates the Coastal Act. Also, Burke contends that the Coastal Commission's denial of a fence permit violates Coastal Act policies, which require the protection of the public from the dangerous bluffs and the preservation of environmental habitat and endangered species. Lastly, Burke complains that there was no substantial evidence that the fence detracts from public views or harms public beach access.

However, in view of our holding that pursuant to section 30416, subdivision (c), the 1988 boundary agreement deprived the Coastal Commission of jurisdiction over the fence, it is unnecessary to address Burke's other contentions.

## DISPOSITION

The judgment is reversed.

The trial court is directed (1) to grant the petition for a writ of administrative mandamus to compel the Coastal Commission to vacate its denial of the

permit for the fence, and (2) to enter judgment declaring that the Coastal Commission lacks jurisdiction over the fence because of the 1988 boundary agreement.

Burke is entitled to his costs on appeal.

Doi Todd, J., and Ashmann-Gerst, J., concurred.