[No. A129873. First Dist., Div. One. June 29, 2011.]

CITIZENS FOR A BETTER EUREKA, Plaintiff and Appellant, v. CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

1578

COUNSEL

Pacific Legal Foundation, Paul J. Beard II and Damien M. Schiff for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, John A. Saurenman, Assisstant Attorney General, Christiana Tiedemann and Joel S. Jacobs, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**MARCHIANO, P. J.**—A developer planned an extensive marina project on a 43-acre site near Humboldt Bay in the City of Eureka (City). This case concerns the jurisdiction of the California Coastal Commission (Commission) over phase 1 of the proposed mixed-use development project. The City, having issued nuisance abatement orders concerning the site, finally issued a coastal development permit (CDP) for phase 1. The CDP has been appealed to the Commission. Plaintiff Citizens for a Better Eureka (CBE) is challenging the Commission's appellate jurisdiction over the CDP.

■ At issue is Public Resources Code section 30005, subdivision (b),[1] which states no provision of the California Coastal Act of 1976 (§ 30000 et seq.; Coastal Act) "is a limitation . . . : [¶] . . . [¶] (b) On the power of any city . . . to declare, prohibit, and abate nuisances." We interpret this statute to authorize developments that are confined to nuisance abatement to proceed without a CDP. Where, as here, the development includes, but is not limited to, nuisance abatement, a CDP is required. Because a CDP is required, the Commission has jurisdiction to determine the CDP appeal. Consistent with these conclusions, we affirm the judgment denying CBE's petition for writ of mandate that seeks to prevent the appeal from going forward.

## I. BACKGROUND

### A. *Coastal Act*

■ A CDP is generally required for a development within the coastal zone as defined in the Coastal Act. (§§ 30103, subd. (a), 30600, subd. (a).) A local government within the coastal zone is required to prepare a local coastal program (LCP) for the portion of the coastal zone within its jurisdiction. (§ 30500, subd. (a).) When the Commission has certified an LCP and actions to implement the LCP have become effective, authority to issue CDP's within the certified area is delegated from the Commission to the local government, subject to appeals to the Commission. (§ 30519, subd. (a).)

Local government actions on CDP applications for certain types of developments, e.g., those within 100 feet of any wetland, are appealable to the Commission (§ 30603, subd. (a)), and the Commission has appellate jurisdiction to determine whether a CDP is consistent with the LCP and coastal

---

[1] Unless otherwise indicated, subsequent statutory references are to the Public Resources Code.

access policies (§ 30603, subd. (b)). In an appeal, the Commission first determines whether a substantial issue as to such consistency has been raised. (§ 30625, subd. (b).) If a substantial issue is presented, the Commission reviews the CDP application de novo. (§ 30621, subd. (a); Cal. Code Regs., tit. 14, § 13115, subd. (b).)

### B. Factual and Administrative Summary

The development site consists of 11 parcels, four of which are known as the "Balloon Track" because locomotives were formerly brought there on a circular track shaped like a balloon. The Balloon Track was used as a railroad switching, maintenance, and freight yard from the 1880's to the 1980's. Some structural foundations and railroad tracks remain, but the site has been vacant since the late 1980's.

CUE VI, LLC (hereafter CUE [standing for "Clean Up Eureka"]), acquired the property in 2006, and proposes to develop it as a mixed-use retail, housing, and open space complex that includes 313,500 square feet of retail space, 104,000 square feet of office space, 72,000 square feet of multifamily residential housing, 70,000 square feet of light industrial space, 14,000 square feet of restaurant space, 12,500 square feet of museum space, 1,590 parking spaces, and an 11.89-acre wetland reserve. The development, called the "Marina Center" project, will proceed in phases, with phase 1 limited to site remediation and wetland restoration. The City approved a CDP for phase 1 in November 2009.

The city council resolution approving the CDP stated that soils at the site were contaminated with petroleum, lead, copper, and arsenic, that overgrown vegetation at the site was creating health and fire hazards, and the site was littered with rubbish. These conditions caused the City to issue 13 nuisance abatement orders for the property from 2000 to 2008, and "continue[d] to threaten to create a public nuisance" under various sections of the Eureka Municipal Code. The North Coast Regional Water Quality Control Board (RWQCB) approved a supplemental interim remediation action plan (SIRAP) that responded to a cleanup and abatement order the RWQCB issued for the property in 2001. "The SIRAP includes a plan for general site clearing and debris removal, a focused soil remediation of areas with contaminated soil, a restoration of the wetlands area, and a grading of the overall site." "Exercising its power to declare and abate nuisances in keeping with section 30005," the CDP resolution ordered CUE to abate the nuisance at the site by implementing the SIRAP.

Findings attached to the resolution state that 5.6 acres of existing wetlands will be filled in during phase 1, and CUE must "ensure that functions and values of replacement wetlands are equal to or greater than the functions and values of the wetlands affected by the project . . . ." Phase 1 will include creation of a permanent wetland reserve surrounding Clark Slough, which bisects the southwest corner of the property. Areas on both sides of Clark Slough "were once marsh wetlands that were filled in, primarily with bay dredge spoils, and subsequently developed. . . . Restoration plans for the site include the restoration of some of the filled-in areas to their former wetlands state." According to the resolution, "[t]he creation of the wetland reserve [will] improve the ability of Clark Slough to drain municipal storm water to Humboldt Bay, and [will] reduce on- and off-site flooding."

The resolution stated the CDP would not become effective until the period for appealing to the Commission had expired. On November 4, 2009, the City issued a notice of final action on the CDP to the Commission. The notice stated: "The action of the City of Eureka is *appealable* to the Coastal Commission pursuant to Public Resources Code, Section 306[0]3. . . . The Final Action is not effective until after the Coastal Commission's appeal period has expired and no appeal has been filed." The City wrote a letter to CUE dated November 12, 2009, that ordered CUE to abate the conditions identified in the CDP resolution as a nuisance by implementation of the SIRAP within 180 days. The letter advised that, if the abatement could not be completed in 180 days, CUE would need to provide a schedule with an estimated completion date for the City's approval.

Three appeals of the CDP, concerned primarily with phase 1's effects on wetlands at the site, were filed with the Commission. CBE members lodged objections to all the appeals with the Commission, arguing that any further review of the CDP would obstruct needed pollution remediation and nuisance abatement, and CBE's counsel in this case filed a letter on behalf of the Pacific Legal Foundation challenging the Commission's assertion of appellate jurisdiction over the CDP. In December 2009, the Commission found the appeals raised a substantial issue as to whether the CDP was consistent with the City's LCP.[2] The Commission asked CUE to submit additional information about the property, and advised that a de novo hearing on the appeals would be scheduled after the information was received.

---

[2] The Commission's staff report on the appeals identified multiple substantial issues. For example, the appeals raised "a substantial issue regarding consistency of the project as approved by the City with the LCP provisions regarding permissible uses for the filling, diking, and dredging of wetlands" because "the wetlands area approved for grading and filling is not reasonably intended for the purpose of restoring the wetlands specifically being modified," and the "subsequent phase mixed-use development would not be for one of the other uses enumerated within [specified land use policies and coastal zoning regulations of the LCP]." <http://documents.coastal.ca.gov/reports/2009/12/Th14c-12-2009.pdf> (as of June 29, 2011).

## C. *Court Proceedings*

CBE filed its petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) in February 2010, arguing that the Commission could not exercise appellate jurisdiction over the CDP because of the section 30005, subdivision (b) directive that no provision of the Coastal Act may limit a city's power to abate nuisances. CBE maintained that "even if the Commission were ultimately to affirm the CDP, the Commission's appellate process would . . . necessarily and unavoidably conflict with the City's determination. . . ." "[T]he Commission's appellate review, which inevitably entails delay in cleanup, limits the City's power to abate present and ongoing threats to the public's health and welfare."

CBE's case was consolidated with a mandate petition against the Commission by CUE that raised the same argument. The Commission demurred to the petitions, and CBE and CUE moved for judgment on the pleadings. The court denied CBE's and CUE's motions for judgment, and sustained the Commission's demurrers without leave to amend. The court found that the phase 1 development "goes far beyond just nuisance abatement," and concluded that section 30005, subdivision (b) did not preclude the Commission from hearing the appeals of the CDP. The court also determined CUE had failed to exhaust administrative remedies before filing the action, a conclusion that CBE acknowledges applied equally to its petition. CUE has not pursued an appeal, but CBE has appealed from the judgment entered for the Commission.

## II. DISCUSSION

### A. *Scope of Review*

"Where a party alleges that the Commission has acted beyond its statutory jurisdiction, it may challenge the agency's order or decision in an action for administrative mandamus under Code of Civil Procedure section 1094.5." (*Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 414 [71 Cal.Rptr.3d 522].) "When the determination of an administrative agency's jurisdiction involves a question of statutory interpretation, 'the issue of whether the agency proceeded in excess of its jurisdiction is a question of law.'" (*Ibid.*) "[C]ourts do not defer to an agency's determination when deciding whether the agency's action lies within the scope of authority delegated to it by the Legislature." (*Burke v. California Coastal Com.* (2008) 168 Cal.App.4th 1098, 1106 [85 Cal.Rptr.3d 909].) A

trial court's ruling on an issue of statutory interpretation is likewise subject to our independent review. (*Donnellan v. City of Novato* (2001) 86 Cal.App.4th 1097, 1103 [103 Cal.Rptr.2d 882].) Under our construction of section 30005, subdivision (b), it is necessary to determine whether the development is limited to nuisance abatement. As this is predominantly a factual question, we review the court's finding on this issue for substantial evidence. (See, e.g., *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427] [scope of review where findings of fact are at issue in a civil appeal].)

### B. *Jurisdiction*

In addressing application of the section 30005, subdivision (b) savings clause in this case, we are writing on a virtually clean slate. The provision appears to have been interpreted only twice in a different setting: in *City of Monterey v. California Coastal Com.* (1981) 120 Cal.App.3d 799 [174 Cal.Rptr. 798] (*Monterey*), and a 1978 opinion letter from the Attorney General to the Commission (Cal. Atty. Gen., Indexed Letter, No. IL 78-73 (May 18, 1978) (hereafter IL 78-73)).

The *Monterey* case involved a reconstruction project on property that was subject to a city nuisance abatement order. At issue in the trial court was whether the work could be done without a CDP under sections 30610, subdivision (d),[3] and 30005, subdivision (b), what the opinion called the "repair and nuisance exceptions," respectively, to the permit requirement. (*Monterey, supra*, 120 Cal.App.3d at p. 807.) The owner, Runyan, obtained two CDP's for the project, but was dissatisfied with the conditions to which the permits were subject. The trial court determined that " '[d]ue solely to the existence of the nuisance and the Order of Abatement issued by the City of Monterey, Runyan may make certain repairs to his buildings without a Coastal Development Permit, as necessary to bring the buildings into code compliance; such repairs being made under the repair exemption (PRC § 30610) for the purpose of abating the nuisance (PRC § 30005 [b]).' " (*Monterey, supra*, at p. 805.)

While the Commission's appeal was pending, the structures to be repaired were destroyed by a fire that "mooted the nuisance and repair issues." (*Monterey, supra*, 120 Cal.App.3d at p. 805.) However, in dicta, the Court of

---

[3] Section 30610, subdivision (d) provides a CDP is not required for: "Repair or maintenance activities that do not result in an addition to, or enlargement or expansion of, the object of those repair or maintenance activities; provided, however, that if the commission determines that certain extraordinary methods of repair and maintenance involve a risk of substantial adverse environmental impact, it shall, by regulation, require that a permit be obtained pursuant to this chapter."

Appeal said it "assume[d] that since Runyan applied for a coastal permit, his proposed remodeling was in excess of that required simply to abate the nuisance pursuant to section 30610, subdivision (d)" (*Monterey, supra,* at p. 802, fn. 6), and the court indicated, "[w]ere we called upon to rule on the judgment, we would reverse, as the project exceeds the scope of the repair and nuisance exceptions (§§ 30610, subd. (d), 30005, subd. (b) . . .)" (*Monterey, supra,* at p. 807).

In IL 78-73, the Commission's executive director asked the Attorney General to opine on whether a CDP was required prior to abatement of a nuisance declared by a local government, where the abatement would otherwise constitute a development under the Coastal Act. The opinion, citing section 30005, subdivision (b), concluded that neither a local government nor a person acting under order of a local government was required to obtain a CDP in that situation. In the case of a nuisance abatement, the Commission could not "impose conditions to protect coastal resources," because the power to do so "would improperly circumscribe the power of a local government to abate nuisances." (IL 78-73, *supra,* p. 3, fn. 3.) However, the opinion added that "[i]f the owner's activity exceeds the amount necessary to abate the nuisance, the owner of course must obtain a coastal permit for that additional work." (*Id.* at p. 4.)

These authorities point to an appropriate and workable rule that has been endorsed by Commission staff and which we adopt here: "[W]here a local government properly declares a nuisance and requires abatement measures that are narrowly targeted at abating the declared nuisance, those measures do not require a [CDP]."[4] On the other hand, a CDP is required if the development "activity exceeds the amount necessary" (IL 78-73, *supra,* p. 4) "simply to abate the nuisance" (*Monterey, supra,* at p. 802, fn. 6).[5]

---

[4] We are quoting here from a May 2010 Commission staff memorandum pertaining to another development, which has been included in the record in this case.

[5] The Commission devotes considerable attention to the decision in *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921 [38 Cal.Rptr.3d 220, 126 P.3d 1040] (*Pacific Lumber*), which it claims rejects CBE's reading of the statute. However, the Commission's reliance on *Pacific Lumber* is misplaced. *Pacific Lumber* is a case where two state agencies, the Department of Forestry and Fire Protection and the RWQCB, exercised "overlapping jurisdiction" over a timber harvesting project that affected water resources. (*Id.* at pp. 936, 941.) The RWQCB required the company to take mitigation measures that the Department of Forestry and Fire Protection deemed unnecessary and were not required in the timber harvest plan. The company argued that the RWQCB could not impose conditions beyond those in the timber harvest plan, but the court rejected the argument based on a savings clause like the one here, which stated that no provision of the Z'berg-Nejedly Forest Practice Act of 1973 (§ 4511 et seq.) was a limitation on the regulatory power of another state agency.

Our case, unlike *Pacific Lumber,* does not involve "overlapping jurisdiction" because the Commission in effect exercises *superseding* jurisdiction in a CDP appeal. (See *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921, fn. 4 [87 Cal.Rptr.3d 365]

■ This narrow construction of the section 30005, subdivision (b) "nuisance exception" to the Coastal Act is consistent with the directive that the Coastal Act "be liberally construed to accomplish its purposes and objectives." (§ 30009; see, e.g., *Capon v. Monopoly Game LLC* (2011) 193 Cal.App.4th 344, 355 [122 Cal.Rptr.3d 536] ["[i]n light of the legislative directive to construe the Act liberally . . . it is appropriate to construe the exceptions narrowly"]; *Spencer v. Marshall* (2008) 168 Cal.App.4th 783, 798–799 [85 Cal.Rptr.3d 752].) Given the breadth of conditions that can be deemed to constitute nuisances (Civ. Code, § 3479 [including anything that is injurious to health, offensive to the senses, or interferes with the comfortable enjoyment of life or property]), a contrary conclusion that exempted all projects involving some nuisance abatement from Coastal Act requirements would undo the statutory scheme.

As we have said, the trial court found that the development here "goes far beyond just nuisance abatement." This finding was supported by substantial evidence that the development involves wetland restoration, as well as site remediation.[6] The resolution approving the CDP states phase 1 consists of "supplemental interim remedial measures *and* proposed wetland reserve," and the resolution repeatedly refers to the development as "site remediation *and* wetland restoration." (Italics added.) Findings supporting the resolution acknowledged that phase 1 would have a significant environmental effect because it included the filling of "existing palustrine emergent wetlands (as delineated under the Coastal Act)." CUE was required to provide for replacement wetlands using "approaches deemed acceptable to the applicable regulatory agencies (e.g. . . . [the] Commission)." CUE was directed to prepare a "detailed Restoration Plan in accordance with the . . . Commission's Procedural Guidance for the Review of Wetland Projects in California's Coastal Zone: Chapter 2 Enhancement and Restoration." (Italics omitted.) Mitigation measures were required to ensure that phase 1 did not substantially conflict

---

*(McAllister)* [Commission "assumed de novo jurisdiction over the permit application" when it accepted the CDP appeal]; *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569 [106 Cal.Rptr.2d 14] ["If the Commission determines that an appeal presents a 'substantial issue,' the permit application is reviewed de novo; in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements."].) The Commission thus has a veto power over the City that the agencies in *Pacific Lumber* did not possess against each other.

[6] Since the trial court could find that phase 1 is not limited to nuisance abatement because of the planned wetland restoration, we need not determine whether other aspects of the development such as site grading, and removal of building foundations and railroad tracks, also go beyond nuisance abatement. Nor are we called upon to decide whether a CDP would be required for the initial phase of development where that phase is confined to nuisance abatement, but the development as a whole does not.

with LCP policies against significant habitat disruption, including "creation of a wetland buffer and low lighting near the wetland," and "[p]hasing of site remediation and wetland restoration [to] minimize the amount of time that both the existing degraded wetlands and the wetlands in the southwest corner of the site (slated for restoration) are non-functional."

■ The resolution thus makes clear that the wetlands aspects of phase 1 involve environmental and regulatory issues significantly beyond those presented in the "site remediation" portion of the development in which the nuisances identified by the City—contaminated soil, rubbish, and overgrown vegetation—would be abated. Moreover, the wetlands activities in the development implicate fundamental Coastal Act policies at the core of the Commission's jurisdiction. " ' "The highest priority must be given to environmental considerations in interpreting the [Coastal Act]" ' " (*Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 506 [83 Cal.Rptr.2d 850]), and " '[o]f all the environmentally sensitive habitat areas mentioned specifically in the Coastal Act, wetlands and estuaries are afforded the most stringent protection . . .' " (*id.* at p. 515). (See also *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1294, 1296 [38 Cal.Rptr.3d 316].) "[Filling] wetlands is considered to be a development project and is thus subject to the [Coastal] Act's permitting requirements. [§] 30106. Among the most important of the Coastal Act's provisions is the prohibition on siting developments in wetlands except as allowed by [§] 30233." (1 Longtin's California Land Use (2011 Update) Other Environmental Controls, § 5.66[1], p. 685; see § 30233, subds. (a) & (c) [no feasible, less environmentally damaging alternative is available; feasible mitigation measures are taken to minimize adverse environmental effects; functional capacity of wetland is maintained or enhanced]; see also Eureka Mun. Code, § 156.052, subds. (F), (H) & (I) [detailed environmental resource standards for diking, filling, or dredging of wetlands].)

For these reasons, we conclude that a CDP is required in this case.

CBE does not appear to dispute that the section 30005, subdivision (b) "nuisance exception" to the Coastal Act does not apply where a development goes beyond nuisance abatement. In briefing below, CBE "by and large agree[d] with the Commission that a local government could not declare a nuisance, and then order its 'abatement' by the construction of a housing development." However, for CBE, the issue is not whether activities other than nuisance abatement are contemplated, but rather whether an abatement is "excessive or fraudulent." By framing the issue in those terms, CBE seeks to

twist the Commission's legitimate concern that the "nuisance exception" not be read to eviscerate the Coastal Act into an unfounded fear that "nefarious local governments will fraudulently declare all sorts of activities to be nuisances, thus undercutting the Commission's oversight role." But we see no need to analyze the motives of local governments in these matters. Our inquiry is whether a development is a mere nuisance abatement or something more. CBE characterizes phase 1 here as "an abatement plan that . . . include[s] wetlands creation." But the trial court had substantial evidence from which to find that the development transcends nuisance abatement in view of the extensive wetlands restoration activities described in the City resolution approving the CDP.

CBE indeed does not dispute a CDP is required here. CBE reasons that because "[d]evelopment activities within the City's coastal zone are governed by the City's LCP, which is an integral part of the City's municipal code," and "the City is bound by its own code, under which nuisance abatement in the coastal zone must be effected by means consistent with the LCP," "the City could *only* act by issuing a coastal development permit." (See Eureka Mun. Code, § 156.096 [CDP generally required for development in the coastal zone].) But if, notwithstanding section 30005, subdivision (b), the City is bound by its municipal code to require a CDP for abatement of a nuisance in the coastal zone, then presumably the City must also adhere to other LCP provisions of its municipal code that provide for appeals of CDP's to the Commission. (Eureka Mun. Code, §§ 156.006 [defining "appealable development"], 156.108, subd. (C) [Commission hears appeals involving appealable developments], 156.108 [development cannot commence until any appeals to the Commission have been exhausted], 156.112 [City action is suspended if it is appealed to the Commission in accordance with the Commission's regulations].) And apart from the City's need to abide by its codes, we fail to see why, in a case where a CDP is necessary, all of the standards and procedures ordinarily involved in obtaining and issuing a CDP, including appeals to the Commission, would not apply.

CBE's argument in this regard is that section 30005, subdivision (b) requires that nuisance abatement decisions be made by the City, not the Commission. CBE contends, "The degree to which the remedy is perfectly tailored to the public injury is a matter between the City and the property owner, CUE . . . . Section 30005[, subdivision] (b) does not authorize a Commission-led 'Monday morning quarterbacking' session to reevaluate that fit. After all, the central purpose of [s]ection 30005[, subdivision] (b) is to ensure that the Commission does not take action that limits or precludes what

a local government deems necessary to abate a nuisance." Similarly, CBE finds *Monterey, supra*, 120 Cal.App.3d 799, to be irrelevant because it does not address *"how* to determine whether a nuisance abatement is excessive or fraudulent, and *who* gets to decide those issues." As long as the City is the decision maker, CBE is evidently satisfied that section 30005, subdivision (b) does not apply. CBE can thus concede on the one hand that the City was required to issue a CDP for the nuisance abatement here, but maintain on the other hand that the Commission lacks jurisdiction to hear an appeal of that CDP.

■ However, CBE cannot persuasively distinguish between these two stages of the CDP process. Section 30005, subdivision (b) refers broadly to provisions of the Coastal Act, not just Commission jurisdiction, as a limitation on a city's nuisance abatement power. If a CDP is required for a nuisance abatement, then a city must adhere to its LCP in deciding how the abatement will be effected. The Coastal Act policies reflected in the LCP[7] thus will limit the city's nuisance abatement power when it issues a CDP, just as the Commission's jurisdiction over a CDP appeal limits that power. The city will be the initial decision maker, but the city's decision will be governed by Coastal Act standards. Therefore, if the Coastal Act applies, it applies both when a CDP is issued and when a CDP is appealed. The Coastal Act will either limit a city's nuisance abatement power within the meaning of section 30005, subdivision (b) at both stages, or at neither.

■ Under section 30005, subdivision (b), application of the Coastal Act turns on whether a development is limited to nuisance abatement. If it is not so confined, then a CDP is required. If a CDP is required, the procedures provided for CDP's, including appeals to the Commission, must be followed. We have concluded that a CDP is required here, and accordingly reject CBE's argument that the Commission lacks jurisdiction to determine the CDP appeal in this case.[8]

---

[7] "Under the Coastal Act's legislative scheme . . . the LCP and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy. . . . Local government prepares the LCP. (§ 30500, subd. (a).) But the LCP must be submitted for the Commission's approval. (§ 30512, subd. (a).) The Commission may certify the LCP only if it meets the requirements of and is in conformity with the policies of the Coastal Act. (§ 30512, subd. (c).)" (*Charles A. Pratt Construction Co., Inc. v. California Coastal Com.* (2008) 162 Cal.App.4th 1068, 1075 [76 Cal.Rptr.3d 466]; see also *McAllister, supra*, 169 Cal.App.4th at p. 922 [Commission certifies an LCP if it is satisfied that the LCP conforms to the policies and standards of the Coastal Act].)

[8] In view of this conclusion, we need not decide whether CBE is precluded from suing because it failed to exhaust administrative remedies by petitioning for a writ of mandate before the appeal to the Commission had run its course.

## III. CONCLUSION

The judgment denying the petition for writ of mandate is affirmed.

Margulies, J., and Banke, J., concurred.

A petition for a rehearing was denied July 13, 2011, and appellant's petition for review by the Supreme Court was denied September 18, 2011, S195442.