Filed 5/13/26

# IN THE SUPREME COURT OF CALIFORNIA

SHEAR DEVELOPMENT CO., LLC,

Plaintiff and Appellant,

v.

CALIFORNIA COASTAL COMMISSION,

Defendant and Respondent.

S284378

Second Appellate District, Division Six

B319895

San Luis Obispo County Superior Court

20CV-0431

---

## ORDER MODIFYING OPINION

THE COURT:

The request for modification of opinion filed on May 6, 2026, is granted.  The opinion in this matter, filed on April 23, 2026, is modified as follows:

1.  The sentence commencing at the bottom of page 26 of the slip opinion that carries over to page 27 is modified to

1

replace the second reference to "Coastal Act" with "County's LCP" so the sentence reads:

> Read as a whole, the Coastal Act communicates that both local and state goals are important, and neither the County nor the Commission, as local and state entities respectively, should have greater deference accorded to their interpretations of the County's LCP.

> This modification does not affect the judgment.

# IN THE SUPREME COURT OF CALIFORNIA

SHEAR DEVELOPMENT CO., LLC,
Plaintiff and Appellant,

v.

CALIFORNIA COASTAL COMMISSION,
Defendant and Respondent.

S284378

Second Appellate District, Division Six
B319895

San Luis Obispo County Superior Court
20CV-0431

April 23, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Evans, and Stone[*] concurred.

---

[*]      Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

SHEAR DEVELOPMENT CO., LLC v. CALIFORNIA
COASTAL COMMISSION

S284378


Opinion of the Court by Guerrero, C. J.


In 2017, Shear Development Co., LLC (Shear), applied to the County of San Luis Obispo (County) for a coastal development permit to build single family homes in a developed part of Los Osos, an unincorporated town in the County. The County ultimately granted the permit in 2019. The California Coastal Commission (Commission) appealed the County's decision to itself and denied the permit in 2020. The Commission concluded that it had appellate jurisdiction because the proposed development was in a sensitive coastal resource area (SCRA) under the County's local coastal program (LCP) and because there was more than one principal permitted use of the proposed development site under the County's LCP. Shear filed a petition for a writ of administrative mandate in superior court, arguing that the Commission had no appellate jurisdiction on either basis. The trial court denied the petition, finding for the Commission on the SCRA issue. Shear appealed, and the County, as amicus curiae, agreed with Shear's positions. The Court of Appeal affirmed the trial court's judgment.

We granted review to decide the standard of review a court should apply when determining whether the Commission's exercise of appellate jurisdiction over a coastal development permit was proper and, when the Commission and a local government offer conflicting interpretations of an LCP, whether deference is due to either entity's interpretation. To clarify how

1

these principles should be applied, we further decide whether
the proposed development is in an SCRA based on the LCP.
After argument, we requested supplemental briefing on the
Commission's alternative asserted basis for jurisdiction;
namely, whether the Commission has appellate jurisdiction over
a development that is not designated as the only principal
permitted use in a county's LCP.

We hold, first, that a court should exercise its independent
judgment in determining the Commission's appellate
jurisdiction when that jurisdiction depends primarily on
interpretation of an LCP rather than factual matters. An LCP
is enacted law, and the independent judgment standard is well
established as the standard of review for an agency's
interpretation of the law. Second, where two entities offer
incompatible interpretations of a law that both administer, a
court should apply the traditional *Yamaha* factors regarding
agency deference to each entity's interpretation. (See *Yamaha
Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th
1, 12–13 (*Yamaha*).) When the factors do not clearly favor either
interpretation, as here, no deference is due to either. Third, the
proposed development is not in an SCRA because the LCP does
not designate it so. The Commission relies primarily on a single
figure in the LCP, captioned "Figure 6-3" (see pt. II.E.1., *post*),
but this figure does not support the Commission's reading, and
the LCP as a whole supports the opposite reading. The
Commission does not have appellate jurisdiction on this basis.
Fourth, and finally, the Commission does not have appellate
jurisdiction solely because a site has multiple principal
permitted uses. Rather, the Commission has appellate
jurisdiction when the proposed development is not designated

as the principal permitted use — or one of several principal permitted uses — of the site under the local government's LCP. Since Shear's proposed development is for one of several principal permitted uses, the Commission does not have appellate jurisdiction on this basis. Thus, we conclude that the Commission does not have appellate jurisdiction over Shear's permit application and therefore reverse the judgment of the Court of Appeal.

## I.  BACKGROUND

### A. The California Coastal Act

In 1972, due to "[g]rowing public consciousness of the finite quantity and fragile nature of the coastal environment," California voters passed Proposition 20 (as approved by voters, Gen. Elec. (Nov. 7, 1972)), which "created the California Coastal Zone Conservation Commission and directed it to oversee the orderly process of planning for the future development of the California coastline." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 162.)  The Legislature then passed the California Coastal Act of 1976 (Coastal Act) (Pub. Resources Code, § 30000 et seq.),[1] which created the current Commission as the successor to the California Coastal Zone Conservation Commission.  (*Pacific Legal Foundation*, at pp. 162–163.)  The Legislature declared that the basic goals for the coastal zone were, among other things, to:  "(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources.  [¶]  (b) Ensure orderly, balanced utilization

---

[1]     Further statutory references are to the Public Resources Code unless otherwise noted.

and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners." (§ 30001.5, subds. (a)–(c).)

The Commission and local governments share responsibility for planning coastal development. Every city and county in the coastal zone must "prepare a local coastal program for that portion of the coastal zone within its jurisdiction" or ask the Commission to prepare one. (§ 30500, subd. (a).) "The precise content of each local coastal program shall be determined by the local government . . . in full consultation with the commission and with full public participation." (*Id.*, subd. (c).) The city or county must then submit the LCP to the Commission, which will certify the LCP if it complies with statutory requirements. (See § 30512.) Once an LCP is certified, the city or county generally has responsibility for reviewing coastal development permit applications to ensure consistency with the LCP. (See *ibid*.) However, in certain instances specified by statute, the Commission may exercise appellate jurisdiction over the city's or county's permit decisions. (§ 30603, subd. (a).)[2]

_____

[2] The Commission's statutory appellate jurisdiction is limited to five types of developments, which may be briefly summarized as those: (1) between the sea and the first public road paralleling the sea or near the inland extent of any beach or of the mean high tideline of the sea where there is no beach;

### B. The Adoption of the Los Osos LCP and Other Environmental Efforts

Los Osos is an unincorporated coastal community of about 15,000 residents located in central San Luis Obispo County near the south end of Morro Bay, which is connected to the much larger Estero Bay. Since at least the early 1970's, state environmental agencies have raised health and safety concerns regarding septic tank discharges adversely affecting ground and surface water in Los Osos.

After the Coastal Act was passed in 1976, the County began to draft its LCP. The Commission certified the LCP in pieces in the 1980's. One portion of the LCP is the "Estero Area Plan," which covers the region of Estero Bay, including Los Osos, and was certified in 1984.

The County's LCP designates certain areas as sensitive resource areas (SRA), which are defined as "areas with special environmental qualities, or areas containing unique or endangered vegetation or habitat resources." (San Luis Obispo County Code, § 23.07.160.) The LCP also defines an environmentally sensitive habitat or environmentally sensitive habitat area (ESHA) as "[a] type of Sensitive Resource Area where plant or animal life or their habitats are either rare or

_____

(2) in tidelands, submerged lands, or public trust lands or near wetlands, estuaries, streams, or the top of the seaward face of any coastal bluff; (3) in an SCRA; (4) for a use that is not the principal permitted use under applicable zoning laws; or (5) a major public works project or a major energy facility. (§ 30603, subd. (a).) Even in these five instances, the Commission will not exercise jurisdiction unless the potential appeal raises a "substantial issue." (Cal. Code Regs., tit. 14, § 13115, subds. (b)–(c).)

especially valuable because of their special nature or role in an ecosystem and which could easily [be] disturbed or degraded by human activities and development." (San Luis Obispo County Code, § 23.11.030; see also Pub. Resources Code, § 30107.5 [defining " '[e]nvironmentally sensitive area' "].) The Estero Area Plan does not use the term SCRA. The parties dispute the relationship between an SRA and an SCRA, but they agree that at least some SRAs, particularly those that contain an ESHA, are also SCRAs.

In 1988, in response to the water quality issues in Los Osos, the Central Coast Regional Water Quality Control Board established a discharge moratorium that effectively halted most construction and expansions of existing development in Los Osos until the problem of septic tank discharges was solved.

### C. Shear's Initial Development

In 2003, Shear purchased eight residential lots in Los Osos. The lots were zoned as "Residential Single-Family," for which there are three principal permitted uses, including "Single-Family Dwellings." The lots were in an existing developed area that was bound on three sides by residential development.

In 2004, the County approved a coastal development permit authorizing Shear to build one residence on each lot in two phases. In the first phase, Shear could build a total of four homes on lots 2, 4, 6, and 8, and in the second, which would occur only after completion of the Los Osos community sewer, the remaining residences could be built. The Regional Water Quality Control Board exempted the project from the existing septic system prohibition because, as the Commission later

summarized, "the phasing allows the project to maintain one-acre minimums for septic tank disposals."

Two members of the Commission appealed Shear's application to the Commission. At the time, the Commission justified its appellate jurisdiction on the basis that the proposed development was "between the first public road and the sea." (See § 30603, subd. (a)(1).) The Commission approved the first phase of development and denied approval of the second phase because it was "uncertain when a community sewer system will be online" and "the details of anticipated community buildout, treatment plant capacity, and schedules of service remain uncertain." Shear built the residences approved for the first phase.

### D. Changes to Los Osos's LCP and Wastewater Facilities

In 2008, the Commission certified an amendment to the County's LCP. Among other things, this amendment added the SRA at issue here, the Los Osos Dune Sands Habitat.[3]

In 2010, the Commission approved a coastal development permit for the Los Osos Wastewater Project, an infrastructure project consisting of "[c]onstruction and operation of a community sewer system, including a treatment plant, collection/disposal/reuse facilities, and all associated development and infrastructure." This approval included nine special conditions, of which only Special Condition 6 is pertinent

---

[3]     For clarity, we refer to the Los Osos Dune Sands Habitat SRA as the "Los Osos Dune Sands Habitat" or the "LODS SRA" and to the geographical feature of dune sands near Los Osos and Morro Bay as the "Los Osos dune sands."

here. It provides: "Wastewater service to undeveloped properties within the service area shall be prohibited unless and until the Estero Area Plan is amended to identify appropriate and sustainable buildout limits," including proof that "adequate water is available to support development." The Los Osos Wastewater Project was completed in 2016.

### E. Shear's Second Permit Application

In August 2017, Shear applied for a coastal development permit to build the four homes planned for the second phase of development. These homes would be located between the homes built during the first phase of development. In December 2017, the San Luis Obispo County department hearing officer denied the application because the homes were not eligible to connect to the Los Osos wastewater treatment plant, and they were located within an area where a prohibition on new septic systems was in place. Shear appealed that decision to the San Luis Obispo County Board of Supervisors (Board). At a hearing on July 10, 2018, the Board considered the appeal, including Special Condition 6, and voted to tentatively uphold the appeal. The Board directed staff to return to the Board with an environmental determination, findings for approval, and conditions for approval.

Related to the environmental determination, then-endangered (now reclassified as threatened) Morro shoulderband snails were found on one lot, so Shear modified its application to seek approval of residences only on the other three lots. After a further hearing in July 2019, the Board upheld Shear's appeal as to the three lots where no Morro shoulderband snails were found. The Board found that "[t]he capacities of available water supply and sewage disposal

services are sufficient to accommodate both existing
development and allowed development" because Shear was
required to retrofit existing development to save more water
than the new homes were expected to consume.

In August 2019, two members of the Commission appealed
the Board's determination to the Commission for de novo
review. Shear not only defended the County's decision on the
merits but also challenged the Commission's jurisdiction. After
a hearing in July 2020, the Commission denied the permit. The
Commission identified two bases for the Commission's appellate
jurisdiction. First, the Commission concluded that the proposed
residences were in an SCRA based on Figure 6-3 in the Estero
Area Plan. (See § 30603, subd. (a)(3).) Second, the Commission
found that the proposed development was not for the (sole)
principal permitted use for the area; it was for one of several
principal permitted uses.[4] (See § 30603, subd. (a)(4).) On the
merits, the Commission concluded that no adequate wastewater
service was available due to Special Condition 6, and the
development did not adequately protect the ESHA and thus
violated ESHA policies.

In February 2021, Shear filed a petition for a writ of
administrative mandate in superior court. Shear argued that

---

[4] As mentioned above, for the first phase of development in
2004, the Commission based its jurisdiction on section 30603,
subdivision (a)(1), which provides the Commission appellate
jurisdiction over "[d]evelopments approved by the local
government between the sea and the first public road
paralleling the sea." For the second phase of development, the
Commission expressly concluded, "This project is not located
between the nearest public road and the sea," and it has not
relied on subdivision (a)(1) in this case.

the Commission lacked appellate jurisdiction and abused its
discretion in denying the coastal development permit. In
November 2021, the trial court denied the petition. The trial
court concluded that the Commission had appellate jurisdiction
because the proposed development was in an SCRA based on
Figure 6-3, but it rejected the Commission's argument that
appellate jurisdiction was proper because the development was
not for the sole principal permitted use. On the merits, the trial
court found that there was not substantial evidence to support
the Commission's denial of the permit based on ESHA policies,
but the court upheld the Commission's denial of the permit
because there was substantial evidence to support the
Commission's finding that the lots did not have sufficient access
to water and wastewater disposal.

Shear and the Commission both appealed. The County
submitted an amicus curiae brief arguing that the Commission
did not have appellate jurisdiction because, under the County's
reading of the LCP, the proposed development site was not in an
SCRA. In an unpublished opinion filed in February 2024, the
Court of Appeal affirmed. It "concluded that the Commission
properly exercised appellate jurisdiction based on the project's
location in an SCRA" and thus it was "not necessary for [the
court] to consider whether, as the Commission contends in its
cross-appeal, it also has appellate jurisdiction because the
project does not fall within the principal permitted use for its
zoning category." (*Shear Development Co., LLC v. California
Coastal Commission* (Feb. 21, 2024, B319895) [nonpub. opn.]
(*Shear*).) The Court of Appeal also held that, on the merits, "the
Commission did not abuse its discretion because its factual
findings relating to water and wastewater access are supported

by substantial evidence." Shear filed a petition for rehearing, which was denied.

We granted Shear's petition for review in June 2024. On December 11, 2024, the day before the Commission's answer brief was due, a new San Luis Obispo County LCP became effective. According to the Commission, "Shear could apply for and likely obtain a development permit" under the new LCP. Specifically, the Commission reasons that there is no longer any obstacle to Shear connecting its properties to the Los Osos sewer system, and Shear can satisfy the LCP's environmental conditions by paying a mitigation fee. Also, the Commission concedes that the proposed development is not within an SCRA under the new LCP.

After oral argument, we requested supplemental briefing on whether the Commission properly exercised appellate jurisdiction over Shear's coastal development permit on the ground that the development was not designated as the principal permitted use, both under the LCP in effect at the time the Commission exercised appellate jurisdiction and under the current LCP.

## II. DISCUSSION

### A. The New LCP

As an initial matter, the parties dispute the impact of the new LCP on the issues in this case. Shear argues that the LCP in place at the time the County approved the development permit in 2019 governs here. The Commission argues that the new LCP applies.

We need not resolve this dispute because the result is the same either way. The parties agree that under the new LCP,

the Commission cannot exercise jurisdiction on the basis that
the proposed development is in an SCRA. The parties dispute
whether the same was true under the LCP in place in 2019, but
for the reasons that follow, we conclude that the old LCP also
did not designate the development site as an SCRA. Thus,
regardless of whether the LCP in place now or in 2019 governs,
the Commission did not and cannot properly exercise
jurisdiction on this basis.

Also, regarding the issue of whether the proposed
development is for the principal permitted use under the LCP,
the parties have not identified, and we have not found, any
pertinent changes in law between 2019 and now. Thus, whether
we apply the LCP from 2019 or the current LCP does not affect
our analysis.

## B. The Applicable Standard of Review

Shear claims that the Commission "has proceeded
without, or in excess of, jurisdiction." (Code Civ. Proc., § 1094.5,
subd. (b).) For such a claim, the standard of review depends on
whether the issue is legal, factual, or both. Here, the only
disputed issue is legal. Shear claims that the Commission
misinterpreted the old LCP's provisions regarding whether the
proposed development site is in an SCRA. Interpretation of an
LCP is a legal issue, not a factual one, because it concerns
interpretation of enacted law rather than "the establishment of
historical or physical facts." (*Crocker National Bank v. City and
County of San Francisco* (1989) 49 Cal.3d 881, 888 (*Crocker
National Bank*); see also *Schneider v. California Coastal
Com.* (2006) 140 Cal.App.4th 1339, 1343–1344 ["Where
jurisdiction involves the interpretation of a statute, regulation,
or ordinance, the issue of whether the agency proceeded in

excess of its jurisdiction is a question of law"].) A court exercises its independent judgment reviewing an agency's interpretation of the law, applying any appropriate deference to the agency's legal interpretation. (*Yamaha, supra,* 19 Cal.4th at p. 8.) Therefore, the independent judgment standard applies to Shear's claim that the Commission misread the LCP.[5]

The Commission argues that its decision should be reviewed for substantial evidence because whether the site is in an SCRA is predominantly factual and the Commission "weighed site-specific factual evidence relevant to the SCRA determination." For example, the Commission contends that the fact that a specific type of sandy soil, called "Baywood Fine Sands," lies under the development site supports the conclusion that the site is in an SCRA. But Shear does not dispute any of this site-specific factual evidence. Shear does not argue that the ground characteristics of the development site differ from the Commission's description. Nor is any other relevant factual dispute apparent from the record or briefing. When "the material facts in the present case are largely undisputed," the disputed issue is likely to be legal. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 ["the application of law to undisputed facts ordinarily presents a legal question that is

---

[5] We emphasize that we apply independent judgment because the dispute is legal, not because the dispute concerns jurisdiction. Jurisdictional issues may involve disputed facts. (See, e.g., *Citizens for a Better Eureka v. California Coastal Com.* (2011) 196 Cal.App.4th 1577, 1583–1584 (*Citizens for a Better Eureka*).) For such disputes, a different standard of review may apply.

reviewed de novo"]; see also *Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 10 [" '[S]tatutory construction is a matter of law' "].) The disputed issue here is the interpretation of the LCP, a legal issue. (Cf. *Hirschfield v. Cohen* (2022) 82 Cal.App.5th 648, 660 [treating statutory construction as a question of law while considering extrinsic evidence].) For Shear's jurisdictional claim, then, the proper standard is the court's independent judgment.

The Commission relies on four cases applying a deferential standard of review to an agency determination. But all four cases concerned predominantly factual questions. (See *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516; *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1114; *Crocker National Bank*, *supra*, 49 Cal.3d at p. 889; *Citizens for a Better Eureka*, *supra*, 196 Cal.App.4th at p. 1584.) These cases did not apply substantial evidence review to a pure question of law.

The Commission also relies on *Charles A. Pratt Construction Co., Inc. v. California Coastal Com.* (2008) 162 Cal.App.4th 1068. In *Pratt*, the Court of Appeal treated whether the plaintiff's land was designated as an ESHA as a question of fact to which substantial evidence review applied. (*Id.* at pp. 1076–1077.) *Pratt* was mistaken on this point because, as discussed above, whether an LCP designates land as an ESHA is a question of law. This error may not have affected the outcome in *Pratt* because the vast majority of the property at issue in that case was designated as a " 'terrestrial habitat,' " which the LCP explicitly designated as an ESHA. (*Id.* at p. 1077.) Such an unambiguous designation may have led to the same result under any standard. Nonetheless, we hold that the

correct standard here is the court's independent judgment and disapprove *Charles A. Pratt Construction Co., Inc. v. California Coastal Com., supra,* 162 Cal.App.4th 1068 to the extent its analysis is inconsistent with our opinion.[6]

## C. Deference When Agencies Disagree

The next question before us is whether a court should afford any deference to the County's or the Commission's view of the law. The County contends that its interpretation of its LCP is entitled to deference and the Commission's interpretation is not, while the Commission argues the reverse. We hold that neither is entitled to any deference here.

In general, when an agency "interpret[s] a statute within its administrative jurisdiction," a court may defer to the agency's interpretation of the law. (*Yamaha, supra,* 19 Cal.4th at p. 11.) Similar deference applies to "a city's interpretation of its own ordinance." (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434.) But deference is not automatic. "Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent — the 'weight' it should be given — is . . . fundamentally *situational.*" (*Yamaha,* at p. 12.) The deference due to agency interpretations "turns on a legally informed, commonsense assessment of their contextual merit." (*Id.* at p. 14.) In *Yamaha,* we articulated several factors relevant to such an assessment. (*Id.* at p. 12.) Those factors, explored at greater length below, generally assess whether " 'the

---

[6]     *Pratt* was decided by the same division of the same district as decided the present appeal. The parties have not cited, and we have not found, any other Court of Appeal opinion that has applied the substantial evidence standard of review to an agency determination in the absence of disputed questions of fact.

agency has a comparative interpretive advantage over the courts' " and whether " 'the interpretation in question is probably correct.' " (*Ibid*.)[7]

When multiple agencies that administer a statute have provided conflicting interpretations, a court should apply the *Yamaha* factors to each agency to determine not only whether either would be entitled to deference, but also whether either has a *stronger* claim to deference than the other. If one agency is better situated than the other to provide a definitive statutory interpretation to which a court should defer, then the court may assign greater weight to that agency's interpretation. If not, and the agencies offer incompatible interpretations, then the court should perform its interpretive task without deference to either agency.

This approach is consistent with the rationales underlying *Yamaha*. An agency interpreting a statute that it administers "may possess special familiarity with satellite legal and regulatory issues." (*Yamaha, supra*, 19 Cal.4th at p. 11.) An agency may have "expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." (*Id*. at p. 12.) An agency may have followed procedures that "enhance the accuracy and reliability of the resulting administrative 'product.' " (*Id*. at p. 13.) These considerations may give the agency's interpretation

---

[7] *Yamaha* also discussed quasi-legislative rules, which are generally afforded a greater degree of deference. (*Yamaha, supra*, 19 Cal.4th at p. 10.) Here, we are analyzing agency interpretations, not quasi-legislative rules.

"presumptive value." (*Id.* at p. 11.) If they apply to only one agency — for example, if only one of the agencies has pertinent expertise, or only one of the agencies has followed reliable procedures to develop its interpretation — that agency's interpretation is likely to have more weight. But if both agencies are on equal footing, "the fact that the two agencies" that share roughly equal responsibility to administer the same statute "fundamentally disagree on its interpretation argues against the existence of any consistent administrative construction to which we should defer." (*Department of Industrial Relations v. Occupational Safety & Health Appeals Bd.* (2018) 26 Cal.App.5th 93, 106, fn. 6.) Applying the *Yamaha* factors to both agencies that have offered conflicting interpretations thus provides an appropriate means to determine whether either agency's interpretation should receive any deference.[8]

---

[8] We are not confronted here with a situation in which more than one agency administers a statute, but not all pertinent agencies have provided an interpretation. (See, e.g., *California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 501; *Purifoy v. Howell* (2010) 183 Cal.App.4th 166, 182–183.) "Absent agency" cases involve different considerations, such as the risk of "a regulatory regime in which either the same statute is interpreted differently by the several agencies or the one agency that happens to reach the courthouse first is allowed to fix the meaning of the text for all." (*Rapaport v. U.S. Dept. of Treasury* (D.C. Cir. 1995) 59 F.3d 212, 216–217; see also *Chao v. Community Trust Co.* (3d Cir. 2007) 474 F.3d 75, 85; *U.S. Dept. of the Interior v. Federal Energy Regulatory Com.* (1st Cir. 2015) 876 F.3d 360, 364–366.)

### D. Applying the *Yamaha* Factors

There are "two broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation: Those 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' " (*Yamaha, supra,* 19 Cal.4th at p. 12.) When two entities disagree, the questions are whether either entity has a comparative interpretive advantage not only over the courts but also over *the other entity*, and whether the factors indicating correctness are *stronger* for one entity than for the other.[9]

#### 1. *Comparative interpretive advantage*

The factors relevant to an agency's interpretive advantage include whether (1) the agency has relevant "expertise and

---

Also, we do not face a situation in which agencies administer different statutes and disagree about their interplay. For example, in *Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, a regional water quality control board disagreed with a legal interpretation by the Commission on State Mandates. Each agency administered different statutory schemes, and one question presented was whether to classify an issue as falling into one agency's purview such that deference might be appropriate. (*Id.* at pp. 768–769; see also *id.* at pp. 777–778 (conc. & dis. opn. of Cuéllar, J.).) In contrast, here we are concerned with two agencies that administer the *same* statutory scheme.

[9] Courts have deferred to the Commission's interpretation of law and to a county's when there was no disagreement. (See, e.g., *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1289 [deferring to a county's interpretation]; *Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 866 [deferring to the Commission's interpretation].) We express no opinion about the analyses in those cases.

technical knowledge"; (2) "the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion"; and (3) the agency authored and enforces the language in dispute. (*Yamaha, supra,* 19 Cal.4th at p. 12.) The parties focus on the first and third factors, addressing them in an order that reflects their relative importance in this case. We do the same and conclude that these factors do not weigh in favor of deference to either the County's or the Commission's interpretation.

First, regarding authorship and enforcement, an " 'agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Yamaha, supra,* 19 Cal.4th at p. 12.) Ordinarily, we " 'accord significant weight and respect to the long-standing construction of a law by the agency charged with its enforcement.' " (*Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1155.)

Here, the County and the Commission both engage in extensive work to draft, edit, and enforce the County's LCP. In accordance with the Coastal Act, the County "prepare[d] a local coastal program for that portion of the coastal zone within its jurisdiction" and determined "[t]he precise content" of the LCP "in full consultation" with the Commission. (§ 30500, subds. (a), (c).) According to the County, its Board's agenda included "approximately 179 separate agenda items concerning the LCP between 1978 and 2009." The Commission reviewed the County's LCP and amendments, held public hearings, and suggested edits, as it does with LCPs statewide. (§§ 30500, 30512, 30513, 30514.)

The County argues that it has a higher claim to authorship because there are restrictions on the Commission's review of a proposed LCP. For example, regarding land use plans, the Commission's review is "limited to its administrative determination that the land use plan submitted by the local government does, or does not, conform with the requirements of" the Coastal Act. (§ 30512.2, subd. (a); see also § 30513, subds. (b)–(c) [similar restrictions apply to review of zoning ordinances, zoning district maps, and other implementing actions].) This provision expressly preserves local authority by providing, "In making this review, the commission is not authorized by any provision of this division to diminish or abridge the authority of a local government to adopt and establish, by ordinance, the precise content of its land use plan." (§ 30512.2, subd. (a).) Nonetheless, the Commission retains the ability to disapprove and, in effect, to edit land use plans proposed by local governments because the Commission can decline to approve a land use plan without a particular component or provision. This framework provides for a division of authority between the County and the Commission, with neither having the unilateral ability to decide the content of the LCP. The County authored the initial text of the LCP, but the Commission's comprehensive reviewing and editing responsibilities are sufficiently comparable to authorship for deference purposes to put the two entities on equal footing here.

The Commission's and the County's responsibilities continue to be divided similarly after an LCP is certified. The County may propose amendments to be submitted to the Commission for certification. (§ 30514.) As mentioned *ante*, the LODS SRA was added to the County's LCP by such an

amendment in 2008. The Commission reviews amendments following similar procedures to those for reviewing a new LCP, namely that it may approve or disapprove and may suggest edits, but it does not edit the LCP directly. (§ 30514, subd. (b).) The Commission also reviews LCP implementation and may recommend corrective actions to the local government or legislative action to the Legislature, but it cannot change a certified LCP without the involvement of the County. (§ 30519.5.) Again, the amendment and review processes suggest that both the County and the Commission are authors of the LCP.[10]

Also, the County and the Commission both work to administer the LCP. The County makes initial decisions regarding permit applications and handles appeals. (San Luis Obispo County Code, §§ 23.01.042, 23.01.043.) The Commission handles appeals for a subset of permitting decisions, as discussed *ante*. (Pub. Resources Code, § 30603, subd. (a); see also Cal. Code Regs., tit. 14, § 13115, subds. (b)–(c).) For all other permitting decisions, there is no provision allowing appeal from the County's determination to any other agency; the County's determination is final, unless mandamus is sought.[11]

---

[10] Until 1977, the Commission had the power to designate SCRAs unilaterally. (See § 30502, subd. (a).) It did not do so for the LODS SRA, and it no longer has that power. Thus, whether an area is an SCRA is no longer an issue committed solely to the Commission.

[11] Our conclusion might be different if the Commission had plenary authority to review everything the County did to implement the LCP, for example by handling appeals from any permitting decision by the County. But here, the Commission's reviewing authority is limited.

Second, regarding the agency's expertise and technical knowledge, the County states that its planning department, which handles local land use issues, includes 115 positions allocated countywide. The Commission asserts that its staff consists of about 182 people, including environmental scientists, geologists, engineers, and planning managers. Assuming without deciding that we may consider these facts,[12] they suggest that both the County and the Commission have expertise and technical knowledge beyond those ordinarily possessed by a court, but not clearly greater than the other.

None of the foregoing suggests that either entity has a clear interpretive advantage over the other regarding the LCP. Overall, these factors do not weigh in favor of deference to either interpretation in these circumstances.

### 2. *Indications of correctness*

The factors relating to correctness include: (1) "indications of careful consideration by senior agency officials" such as " 'an interpretation of a statute contained in a regulation adopted after public notice and comment' "; (2) "evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing' "; and (3) "indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted." (*Yamaha, supra*, 19 Cal.4th at p. 13.) The principal factor that the parties address is whether either the

---

[12] These facts do not appear in the record, and the parties have not cited a basis for this court to consider them, such as judicial notice. (Evid. Code, § 452.) If we disregarded these assertions as unsupported by record facts, we would come to the same conclusions.

County's or the Commission's interpretation is long standing
and consistent. We hold that this factor does not weigh in favor
of either party because the support they have provided is murky
at best.

The Commission points to three purported examples of the
Commission interpreting urban Los Osos to fall within an
SCRA: (1) a comment in a staff report on an appeal of a coastal
development permit from 1999, (2) a 2001 memorandum from
the executive director of the Commission, and (3) a 2004 staff
report. (Cal. Coastal Com., Staff Report: Regular Calendar
Coastal Development Permit (Aug. 30, 1999) <https://
tinyurl.com/7xc2j6mm> [as of Apr. 23, 2026] (1999 Staff
Report); Cal. Coastal Com., San Luis Obispo County LCP 13569
Determination: Schoenfield Certificates of Compliance (May 30,
2001) p. 12 <https://tinyurl.com/4ckfyevx> [as of Apr. 23, 2026];
Cal. Coastal Com., Appeal Staff Report — Substantial Issue
Determination (Mar. 5, 2004) p. 3 <https://tinyurl.com/
3htdw25h> [as of Apr. 23, 2026].)[13] Based on these examples,
the Commission asserts that it has held a consistent
interpretation of the Los Osos Dune Sands Habitat for two
decades.

However, the first example does not purport to interpret
whether the pertinent part of Los Osos is within an SRA, SCRA,
or ESHA and ultimately finds jurisdiction on another basis.
(1999 Staff Report, *supra*, at pp. 14–15.) The second and third
examples conclude that parts of urban Los Osos were part of

---

[13] All internet citations in this opinion are archived by year,
docket number, and case name at <https://courts.ca.gov/opinion/
cited-supreme-court-opinions>.

*different* SRAs than the one at issue here.  These areas were
designated as SRAs in 1984, but the LODS SRA was not
designated until 2008.  (See San Luis Obispo County Planning
Dept., Land Use Element and Local Coastal Plan, Estero
Planning Area, South Bay Combining Designation (Apr. 12,
1984) p. 039364 <https://tinyurl.com/mvu4vmp8> [as of Apr. 23,
2026].)

There is also some evidence that the Commission's current
interpretation may be inconsistent with its interpretation at the
time the Los Osos Dune Sands Habitat was created in 2008.  At
that time, the Commission recognized that the Estero Area Plan
amendment that added the SRA "does not change existing
standards or programs applicable to the urban area of Los Osos"
and "leaves in place the existing Area Plan language applicable
to the Los Osos urban area."  (Cal. Coastal Com., San Luis
Obispo County Local Coastal Program Major Amendment No. 2-
04 (Part 2) Estero Area Plan (June 27, 2008) pp. A20-10, A20-29
<https://tinyurl.com/5esae4nh> [as of Apr. 23, 2026]; see also *id*.
at p. A20-32 ["the urban area of Los Osos was bifurcated from
this submittal and the urban area development standards for
Los Osos are not proposed to be changed"].)  Because the urban
area of Los Osos was outside the scope of the amendment, the
Commission rejected portions of the amendment that would
apply to the Los Osos urban area.  (See *id*. at p. A20-43.)  These
comments suggest that when the SRA was originally adopted in
2008, the Commission interpreted the SRA as not including the
urban part of Los Osos.

Thus, the Commission has not cited anything
demonstrating that it considered urban Los Osos to be part of
the LODS SRA at any time before the Commission took the

appeal of Shear's development permit, and there is evidence it viewed the LODS SRA differently in 2008. We cannot conclude on this record that the Commission's view is long standing or consistent.

The County also argues that its view is long standing and consistent, but its evidence is similarly inconclusive. Planning Commission meeting minutes from 2004 show that a staff member explained that "outside the U[rban] R[eserve] L[ine] is almost exactly the same boundary as the Los Osos Dune Sands ESHA." (San Luis Obispo County Planning Com., Draft Minutes for Commissioner Review of Estero Plan Update (May 13, 2004) p. 2 <https://tinyurl.com/mr9tzssn> [as of Apr. 23, 2026].) Later in 2004, a staff member stated that the Los Osos Dune Sands ESHA "generally applies to the periphery of Los Osos, not the entire community." (San Luis Obispo County Dept. of Planning and Building, Continued Hearing on Estero Area Plan Update: Response to Comments on Chapter 7 and Land Use Changes (Oct. 19, 2004) p. 7 <https://tinyurl.com/4wbn3764> [as of Apr. 23, 2026].) It is not clear that these comments represent the view of the County rather than those of individual staff. Also, these comments concern a Los Osos Dune Sands ESHA, but the parties agree that the proposed development site is not in ESHA. These comments do not explicitly interpret the boundaries of the SRA at issue here and thus are not directly on point.

Bearing in mind that the County and the Commission disagree, we explained *ante*, that the pertinent question for deference is whether either entity's position bears clearly superior indicia of being correct compared to the other. Here, neither does.

### 3. *Other considerations*

The goal of the *Yamaha* analysis is to arrive at a "legally informed, commonsense assessment of [the] contextual merit" of an agency's interpretation of law. (*Yamaha, supra,* 19 Cal.4th at p. 14.) In support of their respective positions, the County and the Commission also both suggest that courts should consider the overarching goals of the Coastal Act. Individual provisions of the Coastal Act alternately favor the County and the Commission, depending on which portion is quoted. We conclude that the stated goals of the Coastal Act, considered as a whole, do not favor either the County or the Commission.

For example, the County relies on the Legislature's declaration, "To achieve *maximum responsiveness to local conditions, accountability, and public accessibility*, it is necessary to *rely heavily on local government* and local land use planning procedures and enforcement." (§ 30004, subd. (a), italics added.) This provision emphasizes local control and could be read to favor the County.

But, as the Commission points out, the Legislature also declared that for other goals, including "to provide *maximum state involvement* in federal activities allowable under federal law or regulations or the United States Constitution which affect California's coastal resources," "it is necessary to provide for *continued state coastal planning and management* through a state coastal commission." (§ 30004, subd. (b), italics added.) This provision emphasizes state control and could be read to favor the Commission.

To determine legislative intent, however, we do not read isolated provisions. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) Read as a whole, the Coastal Act communicates that

both local and state goals are important, and neither the County
nor the Commission, as local and state entities respectively,
should have greater deference accorded to their interpretations
of the Coastal Act.  For example, the Legislature also declared
that one "basic goal[] of the state for the coastal zone" is to
"[e]ncourage *state and local initiatives and cooperation* in
preparing procedures to implement *coordinated planning and
development* for mutually beneficial uses, including educational
uses, in the coastal zone."  (§ 30001.5, subd. (e), italics added.)
This provision is consistent with the overall structure of the
Coastal Act, which encourages both state and local involvement.

Based on the foregoing, we conclude that neither the
County's nor the Commission's interpretation is entitled to
deference here.  Neither entity has demonstrated a clear
interpretive advantage over the other, a significantly stronger
showing of factors indicating rightness, or any other reason for
deference.  The Commission concedes that "de novo judicial
review of legal questions without deference to any party's
interpretation would also be a defensible approach," and we
conclude that this approach is appropriate in this situation.

### E. The Proposed Development Is Not in the Los Osos Dune Sands Habitat

The Court of Appeal correctly stated, "We independently
review the question whether the Commission's exercise of
jurisdiction here is consistent with the Coastal Act."  (*Shear*,
*supra*, B319895.)  But the Court of Appeal described Figure 6-3
in the Estero Area Plan as "substantial evidence" supporting the
Commission and affirmed without more.  (*Ibid*.)  The Court of
Appeal's opinion reflects substantial evidence review, not the
court's independent judgment.  To clarify, we conduct

independent judgment review and conclude that the proposed
development is not in an SCRA under the old LCP.

The Commission argues that the proposed development is
in an SCRA because it is in an SRA — specifically, the Los Osos
Dune Sands Habitat.[14]  Determining whether this is so requires
construing the LCP's description of the LODS SRA.  Many parts
of the LCP are relevant to this issue, so we must construe the
text " 'in context, keeping in mind [its] purpose, and . . . sections
relating to the same subject must be harmonized, both
internally and with each other, to the extent possible.' " (*People
v. Valencia* (2017) 3 Cal.5th 347, 357.)

### 1. *The text of the LCP*

The Estero Area Plan mentions the Los Osos Dune Sands
Habitat in chapters 6 and 7.  The only explicit description of the
boundaries of the LODS SRA in chapter 6 states, "The areas
underlain by these sands outside of Los Osos are included in the
Sensitive Resource Area combining designation."  This sentence
does not clarify whether the proposed development site is part
of the LODS SRA.  It states that the LODS SRA includes the
dune sands outside of Los Osos, but the proposed development
is in Los Osos, and the term "included," by itself, is ambiguous

---

[14]   Shear contends that "this argument represents a
significant departure from the Commission's position during the
administrative proceedings, where it relied exclusively on the
assertion that the project site was in 'mapped and designated
ESHA.' "  It is true that the Commission originally argued that
the site was mapped ESHA and has now abandoned that
argument.  But the Commission also has consistently, albeit
sometimes with less than perfect clarity, taken the position that
it had appellate jurisdiction because the development site is in
the LODS SRA.

about whether the enumerated item or items are exhaustive.
(Compare *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774
["The 'statutory definition of a thing as "including" certain
things does not necessarily place thereon a meaning limited to
the inclusions'"] with *Television Transmission v. Public Util.
Com.* (1956) 47 Cal.2d 82, 85 ["a legislative declaration that
'public utility' includes those performing certain enumerated
services is not a declaration that those performing other
services, not encompassed by the services enumerated, are
public utilities"].)  Hence, we must look elsewhere to determine
whether urban Los Osos is part of the LODS SRA.

The rest of chapter 6 is suggestive, though not definitive.
The text states, "The southern shore of the Morro Bay estuary,
extending to the southern slopes of the first range of the Irish
Hills and to Los Osos Creek, is comprised of sandy soils —
primarily 'Baywood fine sands,' as identified by the Natural
Resources Conservation Service in the Soil Survey of San Luis
Obispo County, Coastal Part (see Figure 6-3).  These sands also
underlie some areas outside of Los Osos, and occur in the city of
Morro Bay."  These two sentences explain where "sandy soils"
are found, summarizing the results of a soil survey by the
Natural Resources Conservation Service (a federal agency
within the U.S. Dept. of Agriculture).  The area described
includes urban Los Osos, rural Los Osos, and other locations
entirely, such as the City of Morro Bay.[15]  Figure 6-3 (see below),

---

**15**    The description of the Los Osos Dune Sands Habitat SRA
appears in the section related to "Cayucos and Vicinity," not
"Los Osos and Vicinity."  No compelling explanation of this
placement is apparent from the record.

with the title "LOHCP Area and Los Osos Dune Sands"[16] and the caption "Los Osos Dune Sands," matches this description, showing the Los Osos dune sands as present in rural Los Osos, urban Los Osos, and elsewhere, including Morro Bay.  But the text acknowledges that "the most valuable habitat surrounds the more developed portion of Los Osos," suggesting that the dune sands may not be coextensive with the Los Osos Dune Sands Habitat.

---

[16]     LOHCP refers to the Los Osos Habitat Conservation Plan, a separate Los Osos planning document.  It is unclear why Figure 6-3 bears a title from another document.

COMBINING AND OTHER DESIGNATIONS



Figure 6-3: Los Osos Dune Sands

The Commission argues that the phrase, "southern shore
of the Morro Bay estuary, extending to the southern slopes of

the first range of the Irish Hills and to Los Osos Creek," describes the location of the Los Osos Dune Sands Habitat, but the sentence does not mention an SRA. This sentence immediately follows the section title, which is "Los Osos Dune Sands Habitat (SRA)," but this placement is inconclusive. Much of the text after the title provides background information, such as the sentence, "Coastal foredune communities usually occur adjacent to open, sandy beaches and barren active dunes near the coast." This sentence does not designate all coastal foredune communities (or all land adjacent to open, sandy beaches) as an SRA. The only part of this text that directly states where an SRA is found says that it includes the dune sands "outside of Los Osos."

Overall, the pertinent excerpts from chapter 6 do not squarely answer whether urban Los Osos is part of the LODS SRA, but they suggest that it is not. Next, we consider chapter 7, which chapter 6 cross-references by saying, "In order to protect the Los Osos Dune Sands, planning area standards are included in Chapter 7 of this plan."

The primary discussion of the Los Osos dune sands in chapter 7 appears in a portion titled "Los Osos Dune Sands Habitat (SRA)." Notably, this discussion is within the section of chapter 7 describing planning area standards for rural areas, not the section describing standards for the Los Osos urban area. This placement suggests that the LODS SRA is located in or at least primarily focused on the rural areas, not urban Los Osos.

The textual description of the Los Osos Dune Sands Habitat is as follows: "In order to ensure the long-term preservation of the rare and sensitive Los Osos Dune Sands

habitat in the rural areas (an Environmentally Sensitive
Habitat), new development within this SRA (see Figure 6-3 for
location) shall comply with" certain standards that follow. The
reference to "the rural areas" again suggests that the LODS SRA
is not in urban Los Osos.

The parenthetical remark "see Figure 6-3 for location" is
ambiguous. This phrasing suggests that Figure 6-3 depicts the
location of the LODS SRA, but it does not explain exactly *how*
Figure 6-3 depicts the LODS SRA. Figure 6-3 depicts the Los
Osos dune sands and shows a Los Osos urban reserve line
(which it does not otherwise describe). All of urban Los Osos,
including the proposed development, is within the urban reserve
line. Under Shear and the County's interpretation, Figure 6-3
depicts the LODS SRA as primarily the dune sands outside the
urban reserve line. The Commission, on the other hand, argues
that Figure 6-3 depicts the LODS SRA as the entire dune sands,
without regard to the urban reserve line. Both interpretations
are consistent with chapter 7 because under either
interpretation, Figure 6-3 depicts the location of the LODS SRA.
We again must look elsewhere to choose between the two
interpretations.

While Figure 6-3 does not define the Los Osos urban
reserve line, the Estero Area Plan does elsewhere, and other
uses of the phrase also provide useful context. The primary
function of an urban reserve line is to divide land between rural
and urban. Appendix C to the Estero Area Plan contains a
glossary of terms that defines an "Urban reserve line (URL)" as
follows: "The boundary around an urban area that separates
urban land uses from the adjacent rural area, defining land that
is planned for urban growth within the next 20 years." Other

uses of the term are consistent with this definition. Similarly, for the "South Bay" area, which includes Los Osos and the proposed development area, the Estero Area Plan provides, "The urban reserve line encompasses approximately 2,590 acres (four square miles) and allows for future growth through in-filling of existing developed areas and expansion onto adjacent vacant lands."[17] Designating land for urban growth in the near future does not seem consistent with designating it as an SRA — which the LCP defines as an area "with special environmental qualities, or areas containing unique or endangered vegetation or habitat."

Taken together, these definitions and uses of the term "urban reserve line" suggest that the Los Osos Dune Sands Habitat SRA is more likely outside the urban reserve line than both outside and in. Thus, Figure 6-3 illustrates the location of the LODS SRA as primarily the portion of the dune sands outside the urban reserve line.

Text appearing later in chapter 7 is consistent with this interpretation. It provides, "The following provisions are intended to ensure the long-term preservation of the rare and sensitive Los Osos Dune Sands habitat (which is an Environmentally Sensitive Habitat). Such habitat is of relative high quality compared to that on smaller, isolated, undeveloped lots." This description equates the Los Osos Dune Sands habitat with an ESHA, which again suggests that the habitat in

---

[17]     The proposed development here is infill, which the LCP defines as "[d]evelopment of vacant land (usually individual lots or left-over properties) within areas which are already largely developed."

question is not in urban Los Osos because not all of urban Los
Osos is an ESHA. While this portion of chapter 7 does not
explicitly say that the "habitat" to which it refers is coextensive
with the LODS SRA, the identity of words between "Los Osos
Dune Sands habitat" (a recurring phrase in the rest of this
portion of the Estero Area Plan) and the name of the LODS SRA
("Los Osos Dune Sands Habitat") suggests that they are the
same. Similarly, the requirement that private owners of land in
the Los Osos Dune Sands Habitat enter into an agreement that
provides for the "ongoing maintenance of remaining Los Osos
Dune Sands habitat in a natural state" tends to suggest that the
habitat is not already developed and thus does not include urban
Los Osos.

The LCP also includes combining designation maps, which
depict areas designated as SRAs. Both the rural and urban
combining designation maps for the Estero planning area have
some ambiguities. The maps do not label the individual SRAs,
and the SRAs abut each other without clear boundaries.
Nonetheless, some conclusions can be drawn. First, the entire
Los Osos dune sands area *outside* of the developed part of Los
Osos is depicted as an SRA. But the maps do not depict all of
urban Los Osos as an SRA. In other words, they support the
conclusion that Figure 6-3 should be interpreted to depict the
Los Osos Dune Sands Habitat as the portion of the Los Osos
dune sands outside the Los Osos urban reserve line.[18]

---

[18] A small area of dune sands mapped as SRA lies within the
urban reserve line. The proposed development is not within or
near this area. We need not decide here whether the Los Osos
Dune Sands Habitat extends within the urban reserve line to
this small area (or, perhaps, whether this is some other SRA).

The Commission argues that these maps are not dispositive because SRAs can be designated outside these official maps. Assuming that the Commission is correct, something still must designate them. The Commission has not cited anything in the LCP that designates the proposed development site as part of the Los Osos Dune Sands Habitat.

### 2. *Extrinsic evidence*

Beyond the text, the Commission invokes extrinsic evidence about the dune sands. Such considerations may be relevant to the interpretation of an LCP. (See, e.g., *People v. Prudholme* (2023) 14 Cal.5th 961, 975 (*Prudholme*) [explaining that extrinsic aids may provide insight into the intent behind an ambiguous law].) While the text of the LCP suggests that the proposed development is not in the LODS SRA, the text is also sufficiently ambiguous that considering extrinsic evidence is appropriate.

The Commission notes that the proposed development contains Baywood fine sands and that then-endangered Morro shoulderband snails were found nearby. According to the LCP, Baywood fine sands and other sandy soils "provide the soil characteristics that support globally rare habitat" and "support a diversity of native plant species and a number of rare, endangered or threatened species of plants and animals, including the Morro manzanita, Indian Knob mountainbalm, Morro shoulderband snail, and perhaps the last known population of the endangered Morro Bay kangaroo rat." Morro shoulderband snails were found on a nearby lot that is not part of this permit application. Based on the properties of the land, the United States Fish and Wildlife Service inferred that the lots on which Shear seeks to develop "likely" support the Morro

shoulderband snail as well, though site visits have not actually found any. In short, record evidence suggests that some undeveloped spaces in urban Los Osos, particularly the more open spaces, provide habitat for some native species.

But the Commission is not arguing that only these lots, or the open spaces inside the urban reserve line, are designated as an SRA. Rather, the Commission is arguing that all of urban Los Osos is part of the LODS SRA. However, much of urban Los Osos is developed. It seems unlikely that all of it is "of vital interest and sensitivity." (§ 30116 [defining SCRAs].) The Estero Area Plan says that "the most valuable habitat *surrounds the more developed portion* of Los Osos." The purpose of the Los Osos Dune Sands Habitat is "to ensure the long-term preservation of the rare and sensitive Los Osos Dune Sands habitat *in the rural areas.*" The fact that a few parts, but not all, of urban Los Osos provide habitat for rare species does not clearly weigh in favor of concluding that all of urban Los Osos is included in the LODS SRA.

Finally, extrinsic evidence includes not only the facts about the land, but also the legislative history of the Estero Area Plan. (*Prudholme*, *supra*, 14 Cal.5th at p. 975.) As described *ante*, in 2008, when the County proposed amendments to the Estero Area Plan that included adding the Los Osos Dune Sands Habitat, the Commission recognized that the amendments did not affect urban Los Osos. This history suggests that the contemporaneous intent of the enactors of the LCP was that the LODS SRA would not include much, if any, of urban Los Osos.

Overall, the extrinsic evidence suggests that some of urban Los Osos may provide a habitat for rare, local species, but the most valuable habitat is in the rural areas. Also, the

legislative history suggests that at the time that the Los Osos
Dune Sands Habitat was added to the LCP, neither the County
nor the Commission intended for the LODS SRA to include
urban Los Osos. Both of these points tend to confirm the likely
meaning of the LCP's text: the Los Osos Dune Sands Habitat
does not include the proposed development. Thus, the proposed
development is not in an SCRA.[19]

We conclude that the proposed development is not in an
SCRA under the old LCP, and the parties agree that the
proposed development is not in an SCRA under the new LCP.
Under either LCP, the Commission did not properly exercise
appellate jurisdiction under subdivision (a)(3) of section 30603.

### F. Principal Permitted Use

The Commission also asserted a second basis for its
appellate jurisdiction: its appellate jurisdiction over "[a]ny
development approved by a coastal county that is not designated
as the principal permitted use." (§ 30603, subd. (a)(4)(A).) The
County designates three principal permitted uses for the
proposed development site: passive recreation, coastal
accessways, and single-family dwellings. Shear proposed to
build single-family dwellings, one of the three principal
permitted uses. The Commission argues, however, that this is
not "the" principal permitted use — that is, the *sole* principal

---

[19] The parties dispute whether all SRAs are SCRAs and thus
all permits for development in SRAs are within the
Commission's appellate jurisdiction, but we need not express an
opinion on this point because the proposed development is not
within an SRA.

permitted use — so the Commission has appellate jurisdiction under subdivision (a)(4)(A).[20]

We apply well-established principles to this question of statutory interpretation. " ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*People v. Reynoza* (2024) 15 Cal.5th 982, 989–990.)

### 1. *Statutory text*

The statute is framed in the singular: "[a]ny development approved by a coastal county that is not designated as the principal permitted use." (§ 30603, subd. (a)(4)(A).) But, as mentioned *ante*, we read this subdivision in the context of the entire statutory scheme. Thus, in construing section 30603, we

---

[20] Section 30603, subdivision (a)(4)(B) exempts a "residential development project," which is defined as "a multifamily housing project that consists exclusively of residential uses and includes four or more units." (§ 30114.5.) This exemption does not apply to Shear's proposed development.

must bear in mind that another provision of the Public Resources Code provides, "The singular number includes the plural, and the plural the singular." (§ 13.) For convenience, we refer to this and similar provisions as "number inclusivity" provisions.

Many other codes contain number inclusivity provisions. (See, e.g., Civ. Code, § 14, subd. (a); Pen. Code, § 7, subd. (a); Code Civ. Proc., § 17, subd. (a); Evid. Code, § 10; Welf. & Inst. Code, § 13; Veh. Code, § 14.) We have held that a number inclusivity provision "is no mere rubric — it is the law." (*People v. Jones* (1988) 46 Cal.3d 585, 593.) For over a century, we have applied such provisions to avoid overly wooden interpretations of statutes. For example, when an ordinance's text allowed construction of a tunnel " 'for public uses,' " we held that this ordinance also allowed construction of a tunnel for a single public use. (*Larsen v. San Francisco* (1920) 182 Cal. 1, 10 (*Larsen*).) When an ordinance declared it unlawful for " 'any person' " to keep goats within specified distances of some houses, we held that the ordinance "cover[s] a case where the goats are owned by several persons in common." (*In re Mathews* (1923) 191 Cal. 35, 37, 43 (*Mathews*).) In the former case, the plural included the singular. In the latter, the singular included the plural, even in the absence of an express provision about number inclusivity. (*Id.* at p. 43.)

The Courts of Appeal have applied number inclusivity provisions similarly. (See, e.g., *People v. Killian* (2024) 100 Cal.App.5th 191, 211 ["We decide that notwithstanding the plural language stated in [Vehicle Code] section 10802, that section may be violated by tampering with a single VIN"]; *Del Cerro Mobile Estates v. City of Placentia* (2011) 197 Cal.App.4th

173, 183 [rejecting the argument that "because the terms 'grade crossing' and 'grade separation' are singular, the CEQA exemption in section 21080.13 does not apply to projects eliminating more than one grade crossing or reconstructing more than one existing grade separation"]; *Hurley v. Rubis* (1951) 105 Cal.App.2d 95, 97 ["[T]he mere use of the singular does not of itself indicate an intent to restrict the School Boards and County Superintendents power to calling but one election on the subject"].)

As a Court of Appeal has explained, the use of only one number in statutory text, whether singular or plural, may "simply [be] ascribable to a means for simplifying legislative drafting rather than a substantive numerical restriction." (*River Trails Ranch Co. v. Superior Court* (1980) 111 Cal.App.3d 562, 565.) The alternative is to litter the codes with language like "any person or persons," which would diminish readability.

Together with the number inclusivity provision, the plain text suggests that the Commission has jurisdiction over a development that is not designated as the principal permitted use or *uses*. (§ 30603, subd. (a)(4)(A); see also § 13.) That is, if a local government designates several uses, the Commission has appellate jurisdiction under section 30603, subdivision (a)(4)(A) only when the development is not for any of them. This conclusion is consistent with the only Court of Appeal decision of which we are aware that has addressed this issue, albeit in dicta. (*DeCicco v. California Coastal Com.* (2011) 199 Cal.App.4th 947, 951.)

The Commission also relies on the use of the word "the" preceding the phrase "principal permitted use." (§ 30603, subd. (a)(4)(A).) The Commission notes that we have said,

41

"[U]se of the definite article 'the' . . . refers to a specific person, place, or thing." (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1396.) Thus, the Commission argues that the phrase "the principal permitted use" (§ 30603, subd. (a)(4)(A)), means that there must be only one principal permitted use, whereas "a principal permitted use" would have indicated that there could be several.

Notably, the appellate court in *People v. Watson* (2021) 64 Cal.App.5th 474 has rejected substantially the same argument as the Commission makes here. In another context, the court held, "[T]he statute's use of 'the' . . . does not mandate the singular." (*Id.* at p. 485.) In general, we agree that a statute's use of "the" does not mandate the singular. The County's LCP designates three specific things as principal permitted uses for the proposed development site, and referring to "the" principal permitted use invokes those three specific things. We need not strain to read the text as only singular because the word "the" particularizes; "the" can particularize to three specific things just as well as to one.[21] The plain text suggests that the Commission's appellate jurisdiction is limited

---

[21] Nor does the word "principal" necessarily imply the singular. The Legislature has used the word "principal" to modify plural nouns in the Public Resources Code. (E.g., §§ 2740 ["principal mineral commodities"], 520, subd. (a)(2) ["principal purposes"], 32310, subd. (f) ["principal charitable purposes"]; see also Black's Law Dict. (12th ed. 2024) p. 1444, col. 1 [defining "principal" as "[c]hief; primary; most important"]; Merriam-Webster's Collegiate Dict. (11th ed. 2012) p. 987, col. 2 [defining "principal" as, among other things, "a matter or thing of primary importance"].)

to developments that are not designated as any of the principal permitted uses.

## 2. *Extratextual considerations*

The parties make arguments regarding indicia of legislative intent beyond the plain text of the statute. To the extent that we consider these other indicia, we are not persuaded that they should change our interpretation of section 30603, subdivision (a)(4)(A).

The Commission relies on the legislative history of section 30603 and its own interpretation now, which it claims is entitled to deference.[22] But we conclude that the legislative history does not clearly support the Commission's argument, and even giving the Commission's interpretation its due weight, the statutory text, which is contrary to the Commission's interpretation, controls here.

Regarding the legislative history, the text that became subdivision (a)(4)(A) of section 30603 was originally drafted to refer to "a principal permitted use" and later amended to refer to "the principal permitted use." (See Assem. Amend. to Sen. Bill. No. 1277 (1975–1976 Reg. Sess.) Aug. 5, 1976, p. 59 (August 5, 1976 Amendment to Senate Bill No. 1277).) The Commission has not cited, and we have not identified, anything in the legislative history that explains this change, but the committee analysis accompanying the change describes the

---

[22] We afforded no weight to the Commission's interpretation of the County's LCP *ante*, because of the conflict between the County and the Commission. However, the County does not argue that it directly administers the Coastal Act (unlike the LCP). Hence, there is no pertinent conflict for the Coastal Act.

provision as follows: "After certification, only the following
actions are appealable to the Commission: [¶] . . . [¶] 4. Coastal
county approved development not shown as principal permitted
use in local coastal program." (Assem. Com. on Resources, Land
Use, and Energy, Analysis of Sen. Bill No. 1277 (1975–1976 Reg.
Sess.) as amended Aug. 5, 1976, p. 8.) It seems less likely that
the Legislature intended the change from "a" to "the" in the bill
text to have significant meaning when the committee analysis
accompanying this change uses neither.

Moreover, in 1976, section 13 was already part of the
Public Resources Code, and settled law established our
interpretation of number inclusivity provisions. (E.g., *Larsen*,
*supra*, 182 Cal. at p. 10; *Mathews*, *supra*, 191 Cal. at pp. 37, 43.)
We generally assume that the Legislature is aware of pertinent
judicial decisions when it drafts and amends statutes. (*In re
Marriage of Bouquet* (1976) 16 Cal.3d 583, 588.) Changing "a"
to "the," given the background of section 13 and our decisions,
would be a remarkably obscure and unlikely way of restricting
the number of principal permitted uses.

Viewed in context, we interpret the change from "a" to
"the" as stylistic rather than substantive. Before August 5,
1976, section 30603 did not specify whether one or all the
subdivisions must be satisfied before the Commission has
appellate jurisdiction. The August 5 amendment clarified that
the Commission has appellate jurisdiction "for any of the
following," referring to the subdivisions of section 30603.
(Aug. 5, 1976 Amend. to Sen. Bill No. 1277, *supra*, at p. 59.) As
part of that change, the sentence structure of the subdivisions
was changed from "if: [¶] . . . [¶] [t]he development is approved"
to "Any development approved" (*id.*, at pp. 58–59), which

necessitated various conforming edits.  The change from "a" to
"the" appears to be an editorial modification made as part of this
set of edits.

The Commission also notes that the Legislature recently
considered a bill that, as initially drafted, would have changed
the phrase "the principal permitted use" to "a principal
permitted use."  (Sen. Bill No. 951 (2023–2024 Reg. Sess.) as
introduced Jan. 18, 2024, § 3.)  The bill was later amended to
keep the phrase "the principal permitted use" and, instead,
exempt "a local government that is both a city and county"
(currently only San Francisco) from the Commission's appellate
jurisdiction under subdivision (a)(4)(A) of section 30603.  (Sen.
Bill No. 951 (2023–2024 Reg. Sess.) as amended Apr. 3, 2024,
§ 2.)  That form of the bill passed. (See § 30603, subd. (a)(4)(C),
as amended by Stats. 2024, ch. 775, § 1.)[23]  The Commission
describes this history as ratifying the Commission's
interpretation, but we would not go quite so far.

---

[23]    The Commission also cites various statements made by
the bill's author.  But "We have frequently stated . . . that the
statements of an individual legislator, including the author of a
bill, are generally not considered in construing a statute, as the
court's task is to ascertain the intent of the Legislature as a
whole in adopting a piece of legislation." (*Quintano v. Mercury
Casualty Co.* (1995) 11 Cal.4th 1049, 1062.)  Various exceptions
exist, such as, " '[S]tatements about pending legislation are
entitled to consideration to the extent they constitute "a
reiteration of legislative discussion and events leading to
adoption of proposed amendments rather than merely an
expression of personal opinion." ' "    (*Naranjo v. Spectrum
Security Services, Inc.* (2024) 15 Cal.5th 1056, 1085.)  But the
cited statements do not fit within any exception.

The Commission is correct that we may afford more weight to the Commission's interpretation because of the Legislature's recent actions. We "particularly" give weight to an agency interpretation of a statute "when the Legislature, presumably aware of the established administrative construction, has implied its acquiescence therein by amending the governing statute in ways that do not disturb the agency's policy." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1082.) Hence, we may give additional weight to the Commission's interpretation because the Legislature amended section 30603 without changing the phrase "the principal permitted use" in a way that affects the Commission's interpretation.

However, the Commission's view has not been consistent, which reduces its weight. (See *Yamaha, supra*, 19 Cal.4th at p. 13 [" '[A] vacillating position . . . is entitled to no deference' "].) The Commission cites examples in which it has interpreted the phrase "the principal permitted use" as meaning only a single use, but these examples start in 2003. In contrast, in the late 1980's, the Commission certified the County's LCP. To do so, it had to find that the County's LCP conformed to the policies of the Coastal Act. (See § 30512, subd. (a).) The County's LCP provides that "[a]ny approved development not listed in Coastal Table O, Part I of the Land Use Element as a Principal Permitted (P) Use" is appealable to the Commission. (San Luis Obispo County Code, § 23.01.043, subd. (c)(4).) This provision refers to *a* principal permitted use, not *the* principal permitted use. Therefore, in the late 1980's, the Commission seems to have interpreted "the" in subdivision (a)(4)(A) of Public Resources Code section 30603 as consistent with "a" in subdivision (c)(4) of San Luis Obispo County Code section

23.01.043. The Commission's interpretations from 2003 and later only show that the Commission changed its interpretation of section 30603 at some point between the late 1980's and 2003.

As explained *ante*, we agree with the Commission's former position:  the LCP, which refers to "a principal permitted use," is consistent with the Coastal Act, which refers to "the principal permitted use."[24]  (§ 30603, subd. (a)(4)(C).)  After examining the legislative history and affording the Commission's interpretation its due weight, we adhere to our interpretation of the plain text.

### 3. *Policy arguments*

Finally, the parties make policy arguments.  The Commission argues that it must have appellate jurisdiction over developments in the primarily rural counties along the coast unless they designate a single principal permitted use because a wider range of uses increases the likelihood that any given development will cause environmental harm.  The County notes that its *entire coastal zone* is designated for more than one principal permitted use, meaning that all development near the coast in the County would be subject to the Commission's appellate review.  The County argues that this result would be practically absurd.  Also, while the other provisions regarding the Commission's appellate jurisdiction would not be solely surplusage, they would not have any significance in entire counties in the coastal zone, a result the Legislature likely did

---

[24]  The parties dispute whether the LCP or the Coastal Act defines the Commission's appellate jurisdiction, but because we read them as consistent, we need not express any opinion on this point.

not intend. (Cf. *Tuolumne Jobs & Small Business Alliance v.
Superior Court* (2014) 59 Cal.4th 1029, 1038 ["It is a maxim of
statutory interpretation that courts should give meaning to
every word of a statute and should avoid constructions that
would render any word or provision surplusage"].) And to the
extent the Commission is concerned about a county's over-
designation of principal permitted uses, it may express those
concerns in its review of the county's LCP and make
recommendations to the local government or the Legislature.
(§ 30519.5.)

The Commission also points out that most local
governments have acquiesced to the Commission's
interpretation and designated only one principal permitted use
for each zoning type in their LCPs, though it concedes that some
have not. This fact provides little support for the Commission's
position, though, because local governments need the
Commission's approval to amend their LCPs. Hence, they may
have acquiesced to the Commission's interpretation simply out
of expediency. No record evidence suggests that environmental
harm followed from any local government's choice to acquiesce
or not acquiesce to the Commission's interpretation, so we find
this point inconclusive.

Ultimately, the policy arguments that the parties make
are not so decisive that we are persuaded to deviate from the
plain text. Under the plain text, the Commission has appellate
jurisdiction under subdivision (a)(4)(A) of section 30603 only
when the development is not designated as the principal
permitted use — or uses — under the local government's LCP.

Shear's proposed development is for one of the principal
permitted uses of the site. The Commission has no appellate

jurisdiction over Shear's permit application under subdivision (a)(4)(A) of section 30603.

## III. DISPOSITION

We conclude that: (1) a court must exercise its independent judgment to decide whether the Commission properly exercised jurisdiction on the ground that the development is in an SCRA; (2) no deference to the Commission's or the County's interpretation of the LCP is warranted on this record; (3) the proposed development is not in an SCRA; and (4) the Commission does not have appellate jurisdiction on the ground that the site is designated with several principal permitted uses. Consistent with these conclusions, we hold that the Commission had no appellate jurisdiction over Shear's permit application. Accordingly, we reverse the judgment of the Court of Appeal and remand with directions. The Court of Appeal is directed to reverse the order of the trial court denying the petition for writ of administrative mandate and remand with directions to issue the writ of administrative mandate. The writ shall direct the Commission

to vacate its decision and dismiss the appeal for lack of jurisdiction.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**STONE, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Shear Development Company, LLC v. California Coastal Commission

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 2/21/24 – 2d Dist., Div. 6
**Rehearing Granted**

---

**Opinion No.** S284378
**Date Filed:**  April 23, 2026

---

**Court:**  Superior
**County:**  San Luis Obispo
**Judge:**  Rita Federman

---

**Counsel:**

FisherBroyles, Pierson Ferdinand, Paul J. Beard II; Pacific Legal Foundation, Jeremy Talcott and Lawrence Salzman for Plaintiff and Appellant.

Jon Ansolabehere and Rita L. Neal, County Counsel (San Luis Obispo), and Daniel P. Solish, Chief Deputy County Counsel, for the County of San Luis Obispo as Amicus Curiae on behalf of Plaintiff and Appellant.

Best Best & Krieger, Amy E. Hoyt, Gregg W. Kettles, Trevor L. Rusin, Patrick T. Donegan and Antoinette Ranit-Mauro for the League of California Cities as Amicus Curiae on behalf of Plaintiff and Appellant.

Matthew Gelfand, Allyson Richman; and Brian A. Manson for Californians for Homeownership and the California Association of REALTORS® as Amici Curiae on behalf of Plaintiff and Appellant.

Rob Bonta, Attorney General, Samuel T. Harbourt and Michael J. Mongan, State Solicitors General, Daniel A. Olivas, Assistant Attorney General, Cara M. Newlon and Joshua Patashnik, Deputy State Solicitors General, Hallie E. Kutak, Christina Bull Arndt and Mitchell E. Rishe, Deputy Attorneys General, and Helen H. Hong, Principal Deputy State Solicitor General, for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeremy Talcott
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
(916) 419-7111

Cara M. Newlon
Deputy State Solicitor General
300 Spring Street, Suite 7500
Los Angeles, CA 90013
(213) 269-6529